```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
SAUDI ARABIAN AIRLINES CORPORATION,

                Plaintiff,                    MEMORANDUM AND ORDER

           - against -                        21 Civ. 6971 (NRB)

IAGCAS, LLC,

                Defendant.
---------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This is a breach of contract dispute between plaintiff Saudi Arabian Airlines Corporation ("Saudia"), the national airline and flag carrier of the Kingdom of Saudi Arabia, and defendant IAGCAS, LLC ("IAGCAS"), a Florida-based company formed to facilitate the purchase of used aircraft.  In March 2019, IAGCAS signed a sale agreement to purchase 13 used Boeing 777-200ER aircraft from Saudia.  Saudia alleges that after paying for and taking delivery of three of the aircraft, IAGCAS breached the contract by (i) repudiating it due to "price" and (ii) failing to take delivery of the ten remaining aircraft.

Now pending before the Court is Saudia's December 19, 2025 motion for summary judgment against IAGCAS, seeking an award of $41,816,666.64 in contract damages.  ECF No. 76; see also ECF No. 104 at 10.  For the reasons set forth below, Saudia's motion is granted.

**Background**

Before discussing the parties' legal arguments, the Court will briefly recount the critical background of the dispute.

In support of its motion for summary judgment, Saudia submitted a statement of facts pursuant to Local Rule 56.1, ECF No. 82 ("P's 56.1").  IAGCAS submitted its own statement of facts and a response, ECF No. 94 ("D's 56.1" or "D's 56.1 Response").[1]  Then Saudia presented a response to IAGCAS's statement, ECF No. 108 ("P's 56.1 Response"), and a reply to IAGCAS's response, ECF No. 109 ("P's 56.1 Reply").[2]  In deciding the motion, the Court

---

[1]    Because IAGCAS's response and counter-statement are contained in the same document, and because they each include independently numbered paragraphs, the Court will cite ECF No. 94 as "D's 56.1" when referring to the portion which presents additional facts for the first time and "D's 56.1 Response" when referring to the portion of the document that responds to the facts listed in P's 56.1.

[2]    "Courts in this district have split on whether to consider a party's Rule 56.1 reply."  United Coal Company, LLC v. Xcoal Energy and Resources, No. 23 Civ. 5709 (ER), 2026 WL 926756, at *1 (S.D.N.Y. Apr. 6, 2026).  Some "[c]ourts in this District have concluded that a reply Rule 56.1 statement constitutes a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules."  W.S.R. by & through Richardson v. FCA US, LLC, No. 18 Civ. 6961 (KMK), 2022 WL 4648403, at *2 (S.D.N.Y. Sep. 30, 2022) (quoting Mayagüez S.A. v. Citibank, N.A., No. 16 Civ. 6788 (PGG) (LCC), 2022 WL 901627, at *9 (S.D.N.Y. Mar. 25, 2022)).  However, others have disagreed, pointing to "no binding authority prohibiting the consideration of such replies."  Adams v. Bloomberg L.P., No. 20 Civ. 7724 (RA) (JLC), 2023 WL 2662607, at *2 (S.D.N.Y. Mar. 28, 2023).  To the extent that P's 56.1 Reply makes legal arguments regarding D's 56.1 Response, "[t]he Court is capable of determining whether [the non-movant] improperly disputed a fact without needing [the movant] to file a procedurally improper document explaining as much."  W.S.R., 2022 WL 4648403, at *2 (quoting G.S. v. Pleasantville Union Free Sch. Dist., No. 19 Civ. 6508 (CS), 2020 WL 4586895, at *1 n.2 (S.D.N.Y. Aug. 10, 2020)).  However, the Court may consider P's 56.1 Reply to the extent "[IAGCAS's] Rule 56.1 responses appear[] to raise new facts not responsive to [Saudia's] original Rule 56.1 statement."  Adams, 2023 WL 2662607, at *2.  Put differently, insofar as IAGCAS has taken facts that it should have placed in its own statement of facts and instead inserted them into its response to Saudia's statement, the Court may consider Saudia's 56.1 reply as if it were a first-time response.  See Pape v. Dircksen & Talleyrand Inc., 2019 WL 1435882 (MKB) (SJB), at *3

has only considered the parties' 56.1 statements insofar as they are accompanied by citations to admissible evidence in the record. See Fed. R. Civ. P. 56(c).  Similarly, the Court has "disregard[ed] . . . responses that are unresponsive to the asserted fact, and any improper argumentation."  Julian v. MetLife, Inc., No. 17 Civ. 957 (AJN), 2021 WL 3887763, at *6 (S.D.N.Y. Aug. 31, 2021) (internal quotation marks omitted).

## I.   The Parties

As noted earlier, Saudia is the national "flag carrier" airline of the Kingdom of Saudia Arabia (the "Kingdom").[34]  IAGCAS is a Florida limited liability company with two members, the Cooper Delaware Family Trust and Mauricio Luna (as trustee of the Mauricio Luna Revocable Living Trust).[5]  The Cooper Delaware Family Trust is Brian Cooper's ("Cooper") family trust.[6]  Cooper and Mauricio Luna ("Luna") are together co-managers of IAGCAS.[7]  IAGCAS was formed "to facilitate the purchase of aircraft," and has no physical assets, only two bank accounts, no employees, and insufficient funds to "independently complete the transaction"

---

(E.D.N.Y. Feb. 1, 2019) (rejecting movant's "Reply Rule 56.1 Statement, except to the extent it responded to the new facts in [non-movant's response to movant's original 56.1 statement]").

[3]    P's 56.1 ¶¶ 1-3; D's 56.1 Response ¶¶ 1-3.

[4]    Saudia is regulated by, but is legally distinct from, the Saudi "General Aviation Civil Authority" ("GACA"), the Saudi equivalent of the U.S. Federal Aviation Authority.  P's 56.1 ¶¶ 4-5; D's 56.1 Response ¶¶ 4-5.

[5]    P's 56.1 ¶ 7; D's 56.1 Response ¶ 7.

[6]    P's 56.1 ¶ 7; D's 56.1 Response ¶ 9.

[7]    P's 56.1 ¶¶ 10, 12; D's 56.1 Response ¶¶ 10, 12.

under the sale agreement.[8]  Much of the support for IAGCAS's operations came from employees of the IAG Aero Group, "a series of companies operating in parts supply, engine and aircraft trading, and provision of maintenance repair and overhaul ('MRO') facilities for customized engine services in the commercial aerospace industry."[9]  Luna is a founder and the CEO of the IAG Aero Group.[10]  The parties successfully executed two transactions prior to the events of this case, in which IAGCAS purchased and flew out of the Kingdom four MD-11 aircraft and one Boeing 777-200ER.[11]

## II.  The Contract

On March 13, 2019, after several months of negotiations, Saudia and IAGCAS executed a sale agreement.[12]  ECF No. 1-1 ("SA" or the "Agreement").  Pursuant to the terms of the Agreement, IAGCAS agreed to buy thirteen (13) Boeing 777-200ER aircraft from Saudia at a fixed price of $76,505,000, split evenly as $5,885,000 per aircraft.[13]  SA § 1(A).  The aircraft to be sold were specific

---

[8]     P's 56.1 ¶¶ 16-20; D's 56.1 Response ¶¶ 16-20.

[9]     P's 56.1 ¶¶ 22-28; D's 56.1 Response ¶¶ 22-28.

[10]    P's 56.1 ¶ 21; D's 56.1 Response ¶ 21.

[11]    P's 56.1 ¶¶ 29-32; D's 56.1 Response ¶¶ 29-32.

[12]    Before the agreement was executed, IAGCAS conducted a "partial" initial inspection of some of the aircraft records, "but not the actual aircraft."  P's 56.1 ¶ 38; D's 56.1 Response ¶ 38; see also SA § 2(A) (mentioning this "initial inspection").

[13]    On April 2, 2019, IAGCAS paid Saudia a $1.5 million security deposit P's 56.1 ¶¶ 49-50; D's 56.1 Response ¶¶ 49-50.

planes, each with a unique tail number, e.g., "HZ-AKA," and manufacturer's serial number ("MSN"), e.g., "28344."[14] The contract also included a "right of first refusal" clause, giving IAGCAS the option to purchase eight (8) additional 777-200ERs from Saudia.[15] SA § 1(E). The 777-200ER is an older model of Boeing airplane, and each of the planes in question had been taken out of service in 2016 or 2017 by Saudia.[16]

The Agreement was structured as a "where is, as is" contract, such that IAGCAS purchased the planes "on an **'as is where is'**, basis with all defects detected and/or undetected." SA § 1(A) (emphasis in original).[17] The Agreement also provided for the handover of "[a]ll available pertinent" aircraft records, with the proviso that "[m]issing documents or certificates will not result in non-acceptance of the aircraft or termination of the sale." SA §§ 1(A)-(C).

The Agreement contained specific provisions for in-person, pre-delivery inspections designed to allow IAGCAS to assess and perform any repairs necessary to fly the used planes out of the

---

[14]    P's 56.1 ¶ 45; D's 56.1 Response ¶ 45.

[15]    P's 56.1 ¶¶ 46-47; D's 56.1 Response ¶¶ 46-47.

[16]    See ECF No. 100-34. The price for the aircraft, as well as some other provisions of the contract, reflected that the aircraft were "at the end of their commercially useful lives." See ECF No. 113 ("Williams Report") ¶ 46. The Court notes that the Williams Report was initial filed under seal, but that the portion quoted here, as well as other citations to that report, are general statements, and not proprietary or otherwise eligible for ongoing sealing.

[17]    Article 1(A) also specified "However, such aircraft are to be delivered to the buyers in same condition as inspected." SA § 1(A).

Kingdom.  SA § 2(A).  IAGCAS was given "thirty (30) days after receipt of Saudi Arabian Visas for all of its technicians and management required to complete the inspections."  SA § 2(A).  The Agreement specified "that Upon completion of the inspection, the BUYER shall execute a Technical Acceptance Certificate ['TAC'] for Each AIRCRAFT, as applicable."[18]  SA § 2(B); see also SA § 8.  It further specified that "[a]ny finding during the inspection shall not change the price agreed in Article 3 herein."  SA § 2(A).

The Agreement also contained specific provisions regarding delivery.  It anticipated that each of the 13 aircraft would be delivered in accordance with a "Tentative Delivery Schedule," SA, Exhibit B, and that "Delivery of all aircraft provided herein, however, shall not exceed one hundred eighty (180) calendar days," excluding certain holidays, "from the signature date of the Technical Acceptance Certificate[.]"  SA § 2(D).  Certain delays to this delivery schedule were permissible under a force majeure clause for various events, including "epidemics or quarantine" restrictions.[19]  SA § 6.  IAGCAS was obliged to provide a crew to

---

[18]    The Court will refer to the post-contract inspections performed before the signing of each TAC as "TAC Inspections."

[19]    Article 6 of the Agreement, titled "EXCUSABLE DELAY" did not provide for the termination of the contract in the event of the various "Acts of God" listed.  SA § 6.  Rather, it tolled the parties' obligations in the event of delays caused by a set of enumerated "Acts of God."  IAGCAS does not argue the Covid-19 pandemic terminated the contract; rather it argues that it could not be held to be in breach of its delivery obligations while the pandemic and related quarantine restrictions were still in effect.  See Opp. at 21 ("[F]rom March 11,2020, there was an Excusable Delay, meaning that IAGCAS could not be deemed in default nor responsible for breach of contract during that time.").

transport each aircraft out of the Kingdom after inspections were complete.  SA § 2(E).  Pursuant to the contract, payment was to be made "immediately prior to Delivery of each . . . aircraft" by a wire transfer of $5,885,000, SA § 4(B), although the last of the 13 aircraft would have the $1.5 million security deposit deducted from its purchase price, SA § 4(A).  Although the payment under the contract was split into installments, IAGCAS "declare[d] that the Aircraft purchase price . . . is free of any deduction or claim arising from whatsoever nature and it represents the full amount payable to [Saudia]."  SA § 3(B).

In addition to the provisions listed above, the Agreement contained several relevant disclaimers and protections.  First, the Agreement specified that it could only be amended by a writing signed by the parties.  SA § 7.  Second, IAGCAS disclaimed any and all implied warranties and representations (other than a few limited representations in Article 11(1)).  SA § 11(2).  Third, Saudia disclaimed "any representation or warranty that [the engines of the aircraft] are serviceable . . . without any liability what so ever on the part of Seller in the event the engines are not serviceable."  SA § 1(D).  Fourth, the parties included an acknowledgement from the IAGCAS, that "upon executing the Technical Acceptance Certificate, they are accepting the

---

Put differently, IAGCAS acknowledges that the contract was still in effect during Covid-19, and that after Covid-19 restrictions were lifted, its obligation to perform resumed/would resume.

Aircraft, as applicable, in the condition and configuration of **'AS IS WHERE IS BASIS WITH ALL DEFECTS AND DEFICIENCIES, WHETHER DETECTED OR NOT' BY BUYER'S**, however the aircrafts are to be delivered in same condition as when inspected." SA § 8 (emphasis in original); see also SA § 1(A).  Finally, the Agreement was to be governed and construed in accordance with New York law, with the forum for any dispute to be in New York, New York.  SA §§ 16, 17.

### III. Flight Lease

Saudia and IAGCAS were not the only companies involved in the transaction.  Without Saudia's knowledge, IAGCAS had reached an agreement with a third-party private equity firm called Flight Lease Holding, LLC ("Flight Lease") around the same time that IAGCAS signed the Agreement with Saudia.[20]  IAGCAS would fund its purchases through "back-to-back sale[s]" to Flight Lease, whereby each plane purchased from Saudia would be sold on to Flight Lease.[21] The funds from each sale to Flight Lease would then be used to finance subsequent installment payments of $5,885,000 to Saudia upon delivery of each aircraft.  For example, on December 12, 2019, Flight Lease wired $7,500,000 to IAGCAS for HZ-AKO (MSN 28358), one of the 13 aircraft sold pursuant to the Agreement.[22]  On that

---

[20]    P's 56.1 ¶¶ 50-67; D's 56.1 Response ¶¶ 50-67.

[21]    P's 56.1 ¶ 56; D's 56.1 Response ¶ 56.

[22]    P's 56.1 ¶¶ 59-60; D's 56.1 Response ¶¶ 59-60.

same day, IAGCAS also wired Saudia $5,885,000 for the same aircraft (HZ-AKO).[23]

Three aspects of the Flight Lease arrangement merit specific mention. First, IAGCAS never disclosed "the existence of Flight Lease and its role in the transaction" to Saudia before November 11, 2020.[24] Second, IAGCAS "required the funding from" Flight Lease to finance its payments to Saudia.[25] Third, Flight Lease's commitment to IAGCAS was limited: "Flight Lease only purchased relevant aircraft from IAGCAS on a case-by-case basis" and "Flight Lease did not agree to purchase all 13 Aircraft."[26] This was in contrast to the Agreement between IAGCAS and Saudia, under which IAGCAS had committed to purchase all 13 of the aircraft. The risk here is obvious: if Flight Lease decided to stop repurchasing the planes while the contract was in effect, IAGCAS would not have had the funds to pay for the planes as it took delivery from Saudia. See infra Background Section V; Discussion Section I.a.

---

[23]     P's 56.1 ¶ 130; D's 56.1 Response ¶ 130.

[24]     P's 56.1 ¶ 57; D's 56.1 Response ¶ 57; see also P's 56.1 ¶ 161 (On November 11, 2020 Cooper disclosed that IAGCAS's "financial institution" was unwilling to fund the purchases at the "agreed price"); D's 56.1 Response ¶ 161. In IAGCAS's words "In November 2020, Flight Lease was not willing to pay IAGCAS $7.5 [million] for each of the remaining ten aircraft," as it had done previously. D's 56.1 Response ¶ 168.

[25]     P's 56.1 ¶ 56; D's 56.1 Response ¶ 56.

[26]     P's 56.1 ¶¶ 64-65; D's 56.1 Response ¶¶ 64-65.

## IV.    Performance

After the Agreement was executed, IAGCAS began the process of inspecting and delivering the aircraft.  Saudia assisted IAGCAS, including by helping IAGCAS submit paperwork to the Saudi government for visas, helping IAGCAS obtain records both from certain third-parties, such as Saudi Aerospace & Engineering Industries ("SAEI"), an MRO provider, and otherwise assisting in the TAC inspection and delivery process.[27]  However, all did not proceed smoothly, with IAGCAS pointing in particular to problems with obtaining records from SAEI and permissions from the Saudi military and airport authorities.[28]  Nevertheless, on July 5, 2019, Cooper emailed Saudia with a reaffirmation that "[IAGCAS] intend[s] on managing 2-3 deliveries per month until we are completed."[29]  Saudia expressed its frustration at the pace of deliveries (and corresponding payments), reminding IAGCAS by email on September 3, 2019 that IAGCAS only had 30 days to complete inspections after receipt of the visas.[30]  All the visas had been approved as of September 3, 2019, thus starting the clock for the "30 days" for inspections called for by the contract.[31]  See SA § 2(A) ("BUYER shall have thirty (30) days after receipt of Saudi

---

[27]    P's 56.1 ¶¶ 68-159; D's 56.1 Response ¶¶ 68-159.

[28]    See, e.g., D's 56.1 Response ¶ 97; see also Discussion Section II.b.

[29]    P's 56.1 ¶ 103; D's 56.1 Response ¶ 103.

[30]    P's 56.1 ¶ 109; D's 56.1 Response ¶ 109.

[31]    P's 56.1 ¶ 103; D's 56.1 Response ¶ 103.

Arabian Visas for all of its technicians and management required to complete the inspections."). Cooper was evidently displeased with this timeline and forwarded that September 3 email to Luna with the comment, "We need to request 6 more visas to stretch the clock . . . this will re-set the clock I hope."[32]

After additional visas were requested and issued, the parties corresponded regarding delivery, and IAGCAS transmitted a revised schedule "which . . . anticipated one aircraft delivery in October 2019 and then deliveries of two aircraft per month between November 2019 and April 2020."[33] This schedule seems to have begun with IAGCAS tendering payment for HZ-AKN on October 19, 2019 and taking delivery of the aircraft on November 20, 2019.[34] However, Saudia complained in a December 10, 2019 email to Cooper that "You promised that you will take delivery of two aircraft per month. As of now, 10 days has passed and you haven't yet taken delivery of the first aircraft of the two in this month."[35] Two days later, on December 12, 2019, IAGCAS tendered payment for the second

---

[32]    P's 56.1 ¶ 110; D's 56.1 Response ¶ 110.

[33]    P's 56.1 ¶ 121.  IAGCAS denies Paragraph 121, but its denial is non-responsive, adding merely that Cooper's schedule was contingent on "local support . . . to meet targets."  D's 56.1 Response ¶ 121.

[34]    P's 56.1 ¶¶ 123-26; D's 56.1 Response ¶¶ 123-26.

[35]    Saudia also stated that and that Saudia would have to start passing on GACA "parking fees" to IAGCAS.  P's 56.1 ¶¶ 128-29; D's 56.1 Response ¶¶ 128-29.  This reflected Saudia's view that the 180-day delivery period under the contract had already elapsed, thus triggering provisions in the contract which required IAGCAS to pay for expenses incurred due to delay.  See SA § 2(D) (allocating costs for, inter alia, "parking" to IAGCAS in the event of a delay past the 180-day delivery deadline).

aircraft, HZ-AKO, and took delivery of that plane on January 15, 2020.[36]  Finally, on February 25, 2020, IAGCAS tendered payment for HZ-AKE, the third aircraft.[37]

IAGCAS did not immediately take delivery of HZ-AKE, however. Once the Covid-19 pandemic hit in Spring 2020, the parties began discussing revised schedules for delivery of the aircraft.  Little progress was made while the Kingdom dealt with the effects of Covid-19, and IAGCAS personnel were not able to travel to or stay in the Kingdom during the quarantine period.[38]  However, progress resumed later in 2020.[39]  On September 15, 2020 Cooper sent Saudia visa requests for 11 IAGCAS personnel to travel to the Kingdom, which were subsequently granted by Saudi authorities.[40]  On October 28, 2020, these efforts succeeded, and IAGCAS took delivery if HZ-AKE, the third of 13 planes sold pursuant to the contract.[41][42]

---

[36]    P's 56.1 ¶¶ 128-29; D's 56.1 Response ¶¶ 128-29.

[37]    P's 56.1 ¶ 135; D's 56.1 Response ¶ 135.

[38]    P's 56.1 ¶¶ 136-49; D's 56.1 Response ¶¶ 136-49.

[39]    On August 21, 2020 Cooper notified Saudia that IAGCAS was exercising its right of first refusal for the eight additional planes.  P's 56.1 ¶ 150; D's 56.1 Response ¶ 150.

[40]    P's 56.1 ¶¶ 151-54; D's 56.1 Response ¶¶ 151-54.

[41]    P's 56.1 ¶ 157; D's 56.1 Response ¶ 157.

[42]    IAGCAS's counter-statement of facts primarily includes additional information about the maintenance and storage of the aircraft before, during, and after termination of the Agreement, as well as the parties' performance. See D's 56.1; P's 56.1 Response.  To the extent these facts are relevant to the Court's determination, we recite them in Discussion Section II.

## V.    Repudiation

As detailed in greater depth, infra, Discussion Section I.a., IAGCAS did not respond to communications from Saudia for several weeks following the delivery of HZ-AKE.  Then, on November 11, 2020, Cooper sent the following email to Saudia's representative:

> We would first like to address the Balance of the fleet that needs to [be] dealt with. **We have been in deep discussions with our Financial Institution that is funding this transaction for the last few weeks. After a long hard fought battle I have been denied the approval to continue at the agreed Sale Price.** The Covid Pandemic as an act of God and no fault of any of us and has deeply hurt everyone financially. The fact is that we are now buying 777-300ER's around the same Price we have been paying you for the 777-200ER's. And as a fact the Financial Institution help[s] us fund those Purchases as well so they are keenly aware of the huge decline in Value in the 777-200ER's. After much thought and discussions we have decided to ask if you can renegotiate the sale price? We want to be very clear that we want to complete and fulfill the obligation to remove anything that can be moved out of the Kingdom that can fly. Also if we can negotiate this to a satisfactory Price we can try to close three or more at a time to help expedite this. I also have to protect the Market by making sure that the Last 7 or 8 Aircraft are included as well as the Spare Engine[s] that are Serviceable, I have been shown at JPC. This is the only way forward I see that will get the objective done and remove them from the Kingdom. As we have proven that can accomplish the task.

P's 56.1 ¶ 161; D's 56.1 Response ¶ 161.   The "Financial Institution" that had refused to "fund" the transaction was Flight Lease, the existence and involvement of which Saudia was previously unaware of.  See supra Background Section III.  Saudia responded that it was unwilling to change the price agreed in Article 3 of

the contract, and demanded performance pursuant to the Agreement's terms.[43]    In response, IAGCAS simply repeated its demand for a change is price as the "only way" forward, which was again rebuffed.[44]  Following Cooper's November 11, 2020 email, IAGCAS did not take delivery, tender payment, or inspect any of the ten remaining aircraft sold subject to the Agreement.   P's 56.1 ¶¶ 164-66: D's 56.1 Response ¶¶ 164-66.  On February 18, 2021, Luna advised IAGCAS's accountant that the agreement had been terminated and that Saudia had decided to keep the security deposit because "we [IAGCAS] default . . . it on the agreement."[45]

## VI.  Resale

After the Agreement between the parties had been terminated, Saudia began a search process to locate a new buyer for the undelivered aircraft.  See Discussion Section IV.  It was able to secure a buyer by June 7, 2023, and secured payment for all ten

---

[43]    P's 56.1 ¶¶ 169-70; D's 56.1 Response ¶¶ 169-70; see also P's 56.1 ¶ 170 (quoting ECF No. 79-35) ("We do realize that the COVID19 Pandemic has affected everyone financially. This does not justify IAGCAS request to renegotiate the sale price after all this time since the signature date of the sale agreement. . . . [Saudia] urge[s] IAGCAS to take the proper action to meet its contractual obligations and expedite the process of taking delivery of the remaining ten (10) purchased aircraft. Please confirm your acknowledgment and action accordingly.").

[44]    P's 56.1 ¶¶ 171-72; D's 56.1 Response ¶¶ 171-72; see also ECF Nos. 105-8, 105-9.

[45]    P's 56.1 ¶ 173; D's 56.1 Response ¶ 173.  Saudia also sent a "Notice of Breach" letter to IAGCAS on March 25, 2021, which demanded performance within fourteen days, reiterated that "IAGCAS' request to reduce the purchase price is expressly denied," and stated that the Agreement would be terminated if IAGCAs did not perform.  ECF No. 105-9.  There is no indication that IAGCAS resumed performance following this communication.

remaining aircraft by June 2025.[46]    The aircraft were resold by Saudia for a total of $15,533,333.36.[47]

## Procedural History

On August 18, 2021, Saudia filed its complaint, alleging a single cause of action for breach of contract.  ECF No. 1.  IAGCAS answered on October 26, 2021.  ECF No. 11 ("Answer").  The Court held a conference and entered a case management plan on November 29, 2021.  ECF No. 16.  The action was subsequently stayed from April 20, 2022 to November 18, 2022 while the parties negotiated settlement.  See ECF Nos. 21-24, 27-28, 32-37.  When those discussions failed, discovery continued and was extended on several occasions to allow for, inter alia, the successful resale of the aircraft,[48] and discovery regarding that resale.  See ECF Nos. 41, 43, 48, 53, 59.  Both fact and expert discovery were completed by Fall 2025, and on December 19, 2025, Saudia filed the instant motion for summary judgment.[49][50]    On January 30, 2026,

---

[46]    P's 56.1 ¶ 205; D's 56.1 Response ¶ 205.

[47]    P's 56.1 ¶ 206; D's 56.1 Response ¶ 206.

[48]    On June 20, 2024, the Court denied Saudia's request to bring a motion for summary judgment "while discovery was ongoing" because the Court believed "that resolution of summary judgment motions should be in the context of a full record," including a completed resale process.  ECF No. 59.

[49]    In addition to its Rule 56.1 submissions, see supra Background Section, Saudia filed a summary letter pursuant to this Court's Individual Rule 2(C), ECF No. 80 ("P's 2(C) Letter"), a declaration in support with accompanying exhibits, ECF No. 79 ("Lauriello Decl."), and a memorandum of law in support, Mot.

[50]    The parties also filed motions to redact certain portions of their briefing, Rule 56.1 statements, and to seal certain exhibits, which the Court granted in part and denied in part.  See ECF Nos. 85, 86, 97, 103, 116.  At

15

IAGCAS submitted its opposition papers,[51] and on February 28, 2026, Saudia replied.[52]

## Legal Standards

On a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "The movant bears the burden of demonstrating the absence of a question of material fact." Am. Council of Blind of New York, Inc. v. City of New York, 495 F. Supp. 3d 211, 228 (S.D.N.Y. 2020) (Engelmayer, J.). In deciding the motion, the Court must "construe the evidence in the light most favorable to the non-moving party

---

points this required the refiling of unsealed versions of previously sealed materials. The Court has reviewed all the papers, including the redacted and/or sealed versions of any cited documents. At some points in this opinion the Court has quoted previously sealed material. This material is unsealed sua sponte to the extent it is quoted, due to the strong public interest in access to judicial documents and the Courts inherent power to modify its previous confidentiality/protective orders. See Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004).

[51] In addition to its Rule 56.1 submissions, IAGCAS filed a summary letter, ECF No. 96 ("D's 2(C) Letter"), a memorandum of law, ECF No. 95 ("Opp."), and two declarations, ECF Nos. 100 ("Rosenberg Decl."), 101 ("Cooper Decl."), with accompanying exhibits. IAGCAS also filed an expert declaration, ECF No. 102 ("Cowgill Decl."), as well as an expert report, ECF No. 102-1 ("Cowgill Report"), and rebuttal, ECF NO. 102-2 ("Cowgill Rebuttal Report").

[52] In addition to its Rule 56.1 submissions, Saudia submitted a reply memorandum of law, ECF No. 104 ("Reply"), several fact declarations with supporting exhibits, ECF Nos. 105 ("Lauriello Reply Decl."), 106 ("Khudawrdi Decl."). It also submitted the reports of its expert, John Williams, see Williams Report, ECF No. 107-2 ("Williams Rebuttal Report").

and draw all reasonable inferences in its favor." Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

If the movant meets its initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (citation omitted). The non-movant "must demonstrate more than some metaphysical doubt as to the material facts, and come forward with specific facts showing that there is a genuine issue for trial." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation and internal quotation marks omitted). Importantly, "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law' will preclude a grant of summary judgment." Am. Council of Blind of New York, Inc., 495 F. Supp. 3d at 228 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## Discussion

Saudia moves for summary judgment as to its single asserted cause of action: breach of contract. Mot. at 1. Under New York law, a breach of contract claim has four elements: "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach." Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC, 736 F. App'x. 274, 276 (2d Cir. 2018).

17

Saudia argues that there is no genuine dispute that IAGCAS (i) repudiated the Agreement on November 11, 2020 by refusing to perform without a price change and (ii) failed to complete inspections and take delivery of all 13 aircraft within 180 days of the execution of the first "Technical Acceptance Certificate." Mot. at 1-2, 6, 16, 18-22; Reply at 8-10.  Saudia further argues that there is no genuine dispute that it performed under the Agreement.  Mot. at 8-18; Reply at 5-7.  Next, Saudia moves for judgment as to various affirmative defenses asserted by IAGCAS. Mot. at 23-27; Reply at 11-12.  Finally, Saudia asserts that the amount of contract damages is undisputed, and that it properly mitigated its damages by reselling the ten remaining aircraft following termination of the Agreement.  Mot. at 22-23; Reply at 10-11.  The Court will address each of these issues in turn.

### I.    Whether IAGCAS Breached the Agreement

#### a. Anticipatory Breach

Saudia argues that IAGCAS breached by repudiating the Agreement on November 11, 2020.  Mot. at 6, 16, 21-22; Reply at 8-9.  Repudiation, also referred to as "anticipatory breach," occurs "when, before the time for performance has arisen," or while performance is ongoing but incomplete, "a party to a contract declares his intention not to fulfill a contractual duty."  Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002); see also N.Y. U.C.C. § 2-610 cmt. 2 (when a "fair reading" of a party's

statement is that the party intends "not to perform except on conditions which go beyond the contract, it becomes a repudiation"). "Under the doctrine of anticipatory breach, a wrongful repudiation of the contract by one party before the time of performance entitles the non-repudiating party to immediately claim damages for total breach, and will relieve the non-repudiating party of its obligations of future performance." Alpha Cap. Anstalt v. Shiftpixy, Inc., 432 F. Supp. 3d 326, 337 (S.D.N.Y. 2020) (quoting Aetna Casualty and Surety Co. v. Aniero Concrete Company, Inc., 404 F.3d 566, 587 (2d Cir. 2005)) (internal quotation marks omitted). However, the "announcement of an intention to not perform" must be "positive and unequivocal" for a Court to determine that a contract was repudiated. DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 112 (2d Cir.2010) (citation omitted). "While the question of anticipatory breach is generally an issue of fact for the jury, where, as here, the relevant communications are in writing and unambiguous, the issue may be decided as a matter of law." Rhodes v. Davis, 628 F. App'x 787, 790 (2d Cir. 2015); see also Argonaut P'ship v. Sidek, No. 96 Civ. 1967 (MBM), 1996 WL 617335, at *6 (S.D.N.Y. Oct. 25, 1996), aff'd sub nom. Argonaut P'ship L.P. v. Sidek, 141 F.3d 1151 (2d Cir. 1998); Alpha Cap. Anstalt, 432 F. Supp. 3d at 337.

The essential facts relevant to repudiation are undisputed. In September 2020 -- following the pandemic-related delay -- Saudia

19

successfully assisted IAGCAS in securing Saudi Visas for personnel who could produce a negative Covid-19 test.  P's 56.1 ¶¶ 151-55: D's 56.1 Response ¶¶ 151-55.  These efforts bore fruit when, on October 28, 2020, IAGCAS succeeded in taking delivery of HZ-AKE (MSN 28348), the third of 13 aircraft to be delivered pursuant to the Agreement.  P's 56.1 ¶ 157: D's 56.1 Response ¶ 157.  Dr. Hasan Bjaili, a senior employee at Saudia responsible for the sale process, emailed Cooper the next day and asked him to "please transfer the payment of the next [aircraft] and start the delivery process," but received no response.[53]  P's 56.1 ¶¶ 158-59: D's 56.1 Response ¶¶ 158-59.

On November 11, 2020, Cooper sent the following email to Bjaili:

> We would first like to address the Balance of the fleet that needs to [be] dealt with. **We have been in deep discussions with our Financial Institution that is funding this transaction for the last few weeks.  After a long hard fought battle I have been denied the approval to continue at the agreed Sale Price.** The Covid Pandemic as an act of God and no fault of any of us and has deeply hurt everyone financially. The fact is that we are now buying 777-300ER's around the same Price we have been paying you for the 777-200ER's. And as a fact the Financial Institution help us fund those Purchases as well so they are keenly aware of the huge decline in Value in the 777-200ER's. After much thought and discussions we have decided to ask if you can renegotiate the sale price? We want to be very clear that we want to complete and fulfill the obligation to remove anything that can be moved out of the Kingdom that can fly. Also if we can negotiate this

---

[53]    Cooper also failed to appear at a scheduled meeting with Bjaili on November 2, 2020.  P's 56.1 ¶ 159; D's 56.1 Response ¶ 159.

> to a satisfactory Price we can try to close three or more at a time to help expedite this. I also have to protect the Market by making sure that the Last 7 or 8 Aircraft are included as well as the Spare Engine that are Serviceable, I have been shown at JPC.  This is the only way forward I see that will get the objective done and remove them from the Kingdom. As we have proven that can accomplish the task.

P's 56.1 ¶ 161 (emphasis added): D's 56.1 Response ¶ 161.  The "Financial Institution" Cooper was referring to was Flight Lease, the private equity firm that provided third-party financing to IAGCAS on a plane-by-plane basis, with no guarantee it would fund all 13 planes.  P's 56.1 ¶¶ 54-66; D's 56.1 Response ¶¶ 54-66.  It is undisputed that "IAGCAS did not discuss with Saudia the existence of Flight Lease and its role in the transaction under the Sale Agreement" at any time prior to November 11, 2020.  P's 56.1 ¶ 57: D's 56.1 Response ¶ 57.  Saudia was thus unaware that its agreement with IAGCAS was effectively subject to veto by a third-party, which could withdraw its funding for IAGCAS's purchase at any time.  See Background Section III.

Rather than entertain Cooper's proposal, Bjaili replied on November 25, 2020 as follows:

> [ ] We do realize that the COVID19 Pandemic has affected everyone financially. This does not justify IAGCAS request to renegotiate the sale price after all this time since the signature date of the sale agreement. . . . Therefore, we urge IAGCAS . . . to meet its contractual obligations . . . of taking delivery of the remaining ten (10) purchased aircraft.   Please confirm your acknowledgment and action accordingly.

P's 56.1 ¶ 170: D's 56.1 Response ¶ 170.  It is unclear if Cooper ever replied to Bjaili.  Instead, he directly emailed the Director General of Saudia on November 30, 2020, and repeated his demand to "re-negotiate the sale price" as the "only way forward."  P's 56.1 ¶ 171: D's 56.1 Response ¶ 171.  Cooper also repeated his demand on February 15, 2021, and was again rebuffed.  Reply at 9-10 (citing ECF Nos. 105-8, 105-9).  It is undisputed that after November 11, 2020, IAGCAS tendered no further payments, executed no more TACs, and did not take delivery of any of the ten remaining aircraft.  P's 56.1 ¶¶ 164-66: D's 56.1 Response ¶¶ 164-66.  Saudia thereafter treated the contract as terminated, see D's 56.1 Response ¶ 173; see also Cooper Decl. ¶ 33 (Saudia advised IAGCAS that it was keeping the security deposit), and began a resale process.[54]

There is no genuine dispute that IAGCAS repudiated the Agreement.  Payment of the full sale price was one of IAGCAS's

---

[54]    "In a situation where the non-repudiating party continues to insist on performance, the repudiating party is given an opportunity to repent and to resume the contract during this period of insistence.  The repudiator may retract his repudiation until the other party has elected to terminate the contract or has materially changed his position in reliance on the repudiation." Vision Ent. Worldwide, LLC v. Mary Jane Prods., Inc., No. 13 Civ. 4215 (AT), 2014 WL 5369776, at *5 (S.D.N.Y. Oct. 17, 2014) (internal citations and quotation marks omitted).  Here, IAGCAS reiterated its demand for a price change even after Saudia insisted on performance under the original terms.  By Spring 2021, Saudia treated the contract as terminated, kept the security deposit, thereafter "pursued other purchasers," thus extinguishing IAGCAS's opportunity to retract its repudiation.  In re Randall's Island Fam. Golf Centers, Inc., 272 B.R. 521, 523 (S.D.N.Y. 2002); see also Argonaut P'ship v. Sidek, 1996 WL 617335, at *6 (defendant failed to retract its repudiation).

"contractual duties."[55]    Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 462 (1998).  Cooper's November 11, 2020 email made perfectly clear that IAGCAS would no longer "continue [performance] at the agreed Sale Price" due to the "decline in [v]alue" of Boeing 777-200ERs in the general market, and that a new, "satisfactory Price" was the "only way forward."[56] P's 56.1 ¶ 161; D's Response ¶ 161.  This communication was an unambiguous refusal to perform "except on conditions which go beyond the contract," N.Y. U.C.C. § 2-610 cmt. 2, i.e. unless Saudia granted a price reduction.  See Rhodes, 628 F. App'x at 791 ("[party] unequivocally and positively repudiated the Stipulation by insisting on terms that were not agreed to in the Stipulation"); Allbrand Disc. Liquors, Inc. v. Times Square Stores Corp., 60 A.D.2d 568, 568 (2d Dep't 1977) ("lessor anticipatorily breached its lease when it told the lessee that it 'could not live' with

---

[55]    The "Purchase Price" was fixed at $5,885,000 per aircraft and IAGCAS committed to paying that price regardless of "any finding during the inspection."  SA §§ 2(A), 3.  Further the contract stated that "The BUYER hereby declares that the Aircraft purchase price as specified in items (A) above, is free of any deduction or claim arising from whatsoever nature and it represents the full amount payable to the SELLER."  Id. § 3(B).

[56]    IAGCAS argues that under N.Y. U.C.C. § 2-601, "a buyer can reject nonconforming goods" under the "perfect tender" rule. Opp. at 19.  This argument fails for the simple reason that IAGCAS never rejected any good as nonconforming.  It took delivery of all three aircraft it inspected and then repudiated the remainder of the contract due to "price" and without any complaint as to the purported condition of the aircraft.  See P's 56.1 ¶ 161; D's Response ¶ 161.  Relatedly, the "same condition" provision cited to by IAGCAS, see SA §§ 1(A), 8, was never triggered because IAGCAS never inspected the ten undelivered aircraft.  See infra Discussion Section II.a.i.

23

the lease as drawn and would not allow the lessee to take possession without renegotiation").

IAGCAS argues that it "never terminated the Agreement" and that, in fact, Saudia terminated the Agreement by "refusing to negotiate" with Cooper.  Opp. at 4-5, 21-22.  IAGCAS is plainly incorrect.  Although Cooper inserted a single question mark and the word "request," his November 11, 2020 email, read as a whole, was unequivocal that IAGCAS would only perform "if we can negotiate this to a satisfactory [new] Price."[57]  P's 56.1 ¶ 161 (emphasis added); D's Response ¶ 161.  It is clear Cooper was not merely testing the waters, as he had already lost a "long hard-fought

---

[57]    The only other purported factual dispute raised by IAGCAS as to repudiation is an isolated assertion that "[i]n November 2020, Saudia informed Mr. Cooper by telephone that it considered IAGCAS in default and that Saudia was keeping the security deposit, thereby terminating the Agreement."  Opp. at 22 (citing ECF Nos. 87-1 ("Luna Tr.") at 301:16-302:10; Cooper Decl. ¶ 34). IAGCAS fails to raise a genuine dispute of material fact.  First, the portion of Mr. Luna's deposition testimony makes no mention of when this "verbal" conversation occurred and appears to be discussing an IAGCAS internal email thread in February 2021 where Luna advised his accountant that "we default [the security deposit] on the agreement."  Compare Luna Tr. at 302:2-3 ("But you state 'we default it on the agreement,' correct?") with D's 56.1 Response ¶ 173 ("Mr. Luna advised IAGCAS's ac[c]ountant that the agreement had been terminated because Saudia advised Mr. Cooper that IAGCAS was in default based on the letter and verbal communications that IAGCAS had received from Saudia.").  Second, Paragraph 34 of the Cooper Declaration contains no facts.  Cooper Decl. ¶ 34. The Court assumes that IAGCAS meant to cite to the previous Paragraph 33, which begins with "After accepting delivery of the third aircraft under the Sale Agreement, in November 2020 I wrote to Saudia to request Saudia to re-negotiate the sales price for the remaining Aircraft under the Sale Agreement," and later mentions that "[a]fter exchanging correspondence with Saudia in November 2020, Saudia advised me during a phone call that they considered IAGCAS in default and were keeping the Security Deposit."  Id. ¶ 33.  "So that, as clear as is the summer's sun."  Henry V, I.2.231, https://www.opensourceshakespeare.org/views/plays/play_view.php?WorkID=henry5&Act=1&Scene=2&Scope=scene    (last accessed May 21, 2026).  Mr. Cooper's narrative leaves no doubt that the alleged "phone call" took place "after exchanging correspondence," including the November 11, 2020 email repudiating the contract.  Thus, it does not raise a genuine dispute as to whether IAGCAS repudiated the Agreement on November 11, 2020.

battle" with Flight Lease, IAGCAS's (undisclosed) source of funding.  Id.  Flight Lease's involvement is significant because its refusal to finance any future purchases at the agreed price rendered IAGCAS not only unwilling, but practically unable, to fulfill its contractual obligations.  See Background Section III. Courts have found repudiation in similar circumstances, where the breaching party "secretly enter[ed] into an agreement with a third-party . . . that gave the [third-party] complete control over the prices to be charged for the product."  Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 78 (1st Dep't 2002).  Put differently, "a party to a contract is deemed to have repudiated the contract by giving a nonparty to the contract the power to determine whether the party's contractual obligations will be fulfilled."  Id.

The unequivocal nature of IAGCAS's repudiation is further supported by its conduct after November 11, 2020.  When Saudia refused to renegotiate the price on November 25, 2020, as indeed it was entitled to do, IAGCAS did not back down.  Instead, Cooper elevated and reiterated a near-verbatim demand in his November 30, 2020 email to Saudia's Director General.  P's 56.1 ¶ 171: D's 56.1 Response ¶ 171.  Cooper repeated his demand for a price change to the Director General again on February 15, 2021, and was refused. Reply at 10 (citing ECF Nos. 105-8, 105-9).  Where, "[i]nstead of withdrawing the conditions set forth in the [initial] letter, [the

repudiating party] reiterated the conditions in its [subsequent] letter," courts have found repudiation to be "unequivocal." Mometal Structures, Inc. v. T.A. Ahern Contractors Corp., No. 09 Civ. 2791 (MKB), 2013 WL 764717, at *8 (E.D.N.Y. Feb. 28, 2013); see also In re Best Payphones, Inc., 432 B.R. 46, 56–58 (S.D.N.Y. 2010), aff'd, 450 F. App'x 8 (2d Cir. 2011) ("repeated insistence on extra-contractual terms" is a "plus factor" supporting a finding of repudiation).  There is no evidence in the record that IAGCAS ever withdrew its request for a new price.  It is similarly undisputed that after November 11, 2020 IAGCAS did not inspect, take delivery, or tender the purchase price for any additional planes.  See In re Randall's Island Fam. Golf Centers, Inc., 272 B.R. at 523 (finding repudiation where a "[bidder] responded that he wished to withdraw his bid [and] [d]espite notice from the Debtor that all bids were irrevocable, [bidder] never submitted the required financial information").

Any argument that IAGCAS did not repudiate the Agreement on November 11, 2020 is further undermined by the submission of IAGCAS's expert, Bob Cowgill of ACI Aviation Consulting.  Mr. Cowgill's report, in his own words, "is a retrospective appraisal [of the value of the aircraft], effective November 11, 2020, the day on which Mr. Brian Cooper, Co-Manager of IAGCAS, informed SAUDIA that the company would be unable to proceed with its purchase of the subject aircraft."  Cowgill Report at 5 (emphasis

26

added).  The Cowgill Report references "November 11, 2020" 36 total times and uses that date as the "effective date" for its valuation analysis.[58]  Id.  It is telling that IAGCAS's own expert believed both that November 11, 2020 was the date the contract was terminated and that IAGCAS was the party that was "unable to proceed."  Id.

Based on the record, the Court finds that IAGCAS repudiated the contract as a matter of law and was in breach as of November 11, 2020.[59]

### b. 180-Day Delivery Requirement

Saudia also proffers a second theory of liability, namely, that IAGCAS breached Article 2(D) of the Agreement by failing to take delivery of "all aircraft" within 180 days of the execution of the first Technical Acceptance Certificate.  Mot. at 18-21

---

[58]   The Cowgill Report is an attempt to demonstrate that the planes declined in value between the signing of the Agreement on March 13, 2019 and November 11, 2020 by estimating their "market value" under two scenarios: (1) if the aircraft "were properly stored" and (2) if the aircraft -- as IAGCAS contends -- "have not been properly stored."  Cowgill Report at 4-6.  Notably, the report is not based on inspections of the aircraft themselves on or around November 11, 2020, or at any point.  Id. at 35 ("ACI did not physically inspect the Aircraft nor conducted a cursory maintenance records audit.").  Instead, it is based on data about the value of 777-200ERs in the general market, as well as a series of "extraordinary assumptions" about how their value was affected by Saudia's allegedly deficient storage practices.  Id.

[59]   To recover on a theory of anticipatory breach, the non-breaching party must show it was "ready, willing, and able" to perform its contractual obligations.  In re Randall's Island Fam. Golf Centers, Inc., 272 B.R. at 524; see also Alta Partners, LLC v. BRC Inc., No. 24 Civ. 3741 (AT) (RWL), 2025 WL 567995, at *10 (S.D.N.Y. Feb. 18, 2025), report and recommendation adopted, No. 24 Civ. 3741 (AT) (RWL), 2025 WL 722630 (S.D.N.Y. Mar. 6, 2025).  The Court finds that there is no genuine dispute that Saudia was ready, willing, and able to perform as of November 11, 2020, for the same reasons discussed infra Discussion Section II.

(quoting SA § 2(D)).    IAGCAS responds that Article 2(D) only required that each plane be delivered within 180 days of each corresponding Technical Acceptance Certificate, such that inspections and deliveries could take place on a rolling basis over a number of years.  Opp. at 10-13.  Saudia replies that the plain language of Article 2(D) is unambiguous and that the parties' course of conduct demonstrates there was no confusion about the delivery timeline.  Reply at 3-4 (citing D's 56.1 Response ¶¶ 36 (Cooper said "we will take delivery of all Aircraft within 180 days"); see also D's 56.1 Response ¶¶ 103 (Cooper stated on July 4, 2019 that "[w]e intend on managing 2-3 deliveries per month until we are completed," i.e. approximately 13 planes in 180 days), 118 ("IAGCAS advised Saudia that 'we can target a departure schedule of 2 aircraft per month.'").

The Court need not reach this issue, as it has already determined that IAGCAS breached the agreement as a matter of law by repudiating it on November 11, 2020.  See Reply at 5 ("Any interpretation of Article 2(D) is . . . irrelevant because IAGCAS repudiated the Sale Agreement" on November 11, 2020).  Saudia places the date of IAGCAS's breach of Article 2(D) as "no later than November 14, 2020."  Reply at 9.  IAGCAS's timeline places the Article 2(D) deadline to complete deliveries far later.  See Opp. at 10-12.  Thus, under both parties' timelines, IAGCAS's repudiation occurred before IAGCAS's alleged breach of Article

28

2(D).  There is no reason Saudia must prove multiple breaches of the same agreement, either for the purposes of liability or damages.  Therefore, the dispute regarding the 180-day deadline is not a "dispute[] over facts that might affect the outcome of the suit under the governing law."  Am. Council of Blind of New York, Inc., 495 F. Supp. 3d at 228 (citation omitted).

## II.  Whether Saudia Failed to Perform

In order to recover for breach of contract, there must have been "performance by the party seeking recovery," in this case, Saudia.  Zam & Zam Super Mkt., LLC, 736 Fed. Appx. at 276.  IAGCAS argues there is a genuine dispute of material fact regarding whether Saudia failed to perform its obligations under the contract by (i) improperly failing to maintain the aircraft such that the planes were not in the "same condition as inspected," Opp. at 14-17 (quoting SA § 1(A)); see also Opp. at 7-10, 18-20, and (ii) failing to "use reasonable efforts" to assist IAGCAS in securing Visas, inspecting the aircraft, and/or taking delivery of the aircraft.  Opp. at 17-18 (quoting SA § 2(A)).  We will discuss whether there is a genuine dispute as to either of these issues such as to preclude summary judgment.

### a. Aircraft Maintenance and Storage

IAGCAS devotes much of its brief, expert opinion, and statement of facts to the allegation that "Saudia parked the Aircraft out in a desert 'ditch,' . . . where the Aircraft

deteriorated for years[.]" Opp. at 3.  As relevant to Saudia's performance, IAGCAS argues that various provisions of the Agreement created an express or implied obligation by Saudia to maintain the aircraft in an "approved long-term storage and maintenance program." Id. at 3, 15-17.  Saudia apparently concedes that the aircraft were parked outside near Jeddah and Riyadh International Airports but argues that storing the aircraft outside of a formal program was not a breach of any representation, contractual provision, or implied duty.  Mot. at 8-10, 15-16; Reply at 5-7.

### i.    Article 1(A)

The parties' dispute over Saudia's purported maintenance obligations focuses on of Article 1(A) of the Agreement.  Article 1(A) reads as follows:

> SELLER shall sell and BUYER shall purchase from the SELLER: (A). . . the AIRCRAFT AND the installed ENGINES as further defined in Exhibit "A" attached hereto and the purchase on an **"as is where is"**, basis with all defects detected and/or undetected. However, such aircraft are to be delivered to the buyers in same condition as inspected.

SA § 1(A) (emphasis in original).  IAGCAS argues that the phrase "same condition as inspected" in Article 1(A) refers to the "initial inspection" mentioned elsewhere in Article 2(A) of the Agreement.  Opp. at 7 (citing SA § 2(A) ("BUYER has performed an initial inspection of the aircraft.")).  This "initial inspection" was performed "[p]rior to the execution of the Sale Agreement" on

30

March 13, 2019, and consisted of a "partial inspection of the aircraft records, but not the actual aircraft." D's 56.1 Response ¶ 38. IAGCAS insists that Article 1(A) obliged Saudia to maintain the Aircraft in the "same condition as [initially] inspected" on or before March 13, 2019 through the time the aircraft were delivered, and that Saudia's failure to place the planes in an "long-term storage and maintenance program" breached this provision by ensuring the planes would "rapidly deteriorate." Opp. at 15.

Saudia disagrees with IAGCAS's interpretation of Article 1(A). According to Saudia, the "same condition as inspected" provision refers to the in-person Technical Acceptance Certificate inspections, and only obliged Saudia to maintain the aircraft in the "same condition" between the TAC inspection and delivery, which could be as many as 180 days apart. Mot. at 9-10; see also Article 2(D) ("Delivery of all aircraft provided herein . . . shall not exceed one hundred eighty (180) calendar days . . . from the signature date of the Technical Acceptance Certificate"). Saudia points out that IAGCAS conducted TAC inspections for and successfully took delivery of three of the 13 aircraft in December 2019, January 2020, and October 2020. Mot. at 10. But IAGCAS never conducted TAC inspections of any of the remaining ten aircraft before repudiating the Agreement on November 11, 2020. P's 56.1 ¶¶ 114-15; D's 56.1 Response ¶¶ 114-15. Thus, Saudia's

31

obligation to deliver the ten remaining planes in the "same condition as inspected" was never triggered because no TAC inspections ever took place. Reply at 4-5.

The Court agrees with Saudia: the term "same condition as inspected" in Article 1(A) unambiguously refers to the in-person TAC inspections and not to the "partial," pre-contract inspection of aircraft records. The Court has reached this conclusion for several reasons.

First, the stand-alone term "inspection" is used throughout the contract to refer to the Technical Acceptance Certificate inspection and not to the pre-contract, "initial inspection." Article 2(A) -- which is contained in a different part of the contract than Article 1(A)'s "same condition" requirement -- is the only provision which uses the term "initial inspection," and the use of that term is to distinguish it from the post-signing, TAC inspections mentioned elsewhere. See SA § 2(A). This distinction is evident in Article 2(A) itself:

> BUYER has performed an **initial inspection** of the aircraft. SELLER agrees to use reasonable efforts to assist BUYER's **inspection** of the AIRCRAFT, and all associated records (including complete back-to-birth trace documentation) at Riyadh (KKIA) & Jeddah (KAIA) International Airports. Any finding during the **inspection** shall not change the price agreed in Article 3 herein. BUYER shall have thirty (30) days after receipt of Saudi Arabian Visas for all of its technicians and management required to complete the **inspections**.

Id. (emphasis added); see also Article 2(B) ("Upon completion of the **inspection**, the BUYER shall execute a Technical Acceptance Certificate for Each AIRCRAFT, as applicable.") (emphasis added). The first sentence of Article 2(A) thus describes what has already taken place before the contract was signed (the "initial inspection"). Each subsequent sentence, however, discusses future contractual obligations to "assist . . . inspection," waives any right to change the price based on "any finding during . . . inspection," and provides 30 days to "complete the inspections." There would be no reason to agree regarding "assistance," "finding(s)," or timelines with respect to an inspection which had already taken place. Therefore, it is evident that the unmodified term, "inspection," refers to the Technical Acceptance Certificate inspections to be performed in-person by IAGCAS technicians.

Second, Article 1(A)'s "as is, where is" clause and its "same condition" caveat are reiterated by Article 8 of the Agreement, which IAGCAS concedes is a "mirror" of Article 1(A). See Opp. at 18. That provision reads as follows:

> ARTICLE 8: AIRCRAFT, AS-IS WHERE-IS
>
> BUYER acknowledges/acknowledge that upon executing the Technical Acceptance Certificate, they are accepting the Aircraft, as applicable, in the condition and configuration of **"AS IS WHERE IS BASIS WITH ALL DEFECTS AND DEFICIENCIES, WHETHER DETECTED OR NOT" BY BUYER'S,** however the aircrafts are to be delivered in same condition as when inspected, signature on acceptance receipt in the

33

> form set forth in Exhibit "C" [example TAC] hereof
> shall constitute acceptance of the aircraft in the
> condition and configuration herein defined.

SA § 8 (emphasis in original). The meaning of this provision is clear. By executing each TAC, IAGCAS is accepting the plane in the "condition and configuration" "as is where is" as of the time the TAC is executed. Thereafter, between the TAC inspection and delivery up to 180 days later, the "condition and configuration" could not change. SA § 8; see also id. § 1(A) ("aircraft are to be delivered to the buyers in same condition as inspected").

Third, as Saudia observes, the contract would make no sense if the planes were sold on an "as is where is, basis with all defects detected and/or undetected," but simultaneously had to be "delivered . . . in [the] same condition as [initially] inspected." SA § 1(A). There would be no purpose in disclaiming all "detected and/or undetected" defects if any condition undetected during the initial inspection but detected before delivery constituted breach. Similarly, Article 2(A) explicitly states that "[a]ny finding during the [TAC] inspection shall not change the price" agreed to in Article 3. SA §§ 2(A), 3 ($5,885,000 per aircraft).[60]

---

[60] The price agreed was extremely low, "reflecting an asset at the end of its commercially useful life." Williams Report ¶ 52. The price per aircraft was to be paid in full, but in even installments of $5,885,000 per plane, for a total of $76,505,000. See SA § 3. This flat payment scheme was agreed to despite the fact that each aircraft was "unique," with widely varying actual values. Williams Report ¶ 115. This reflected the parties' understanding that that IAGCAS had to pay the full sales price, which covered all 13 planes. Otherwise, "IAGCAS's strong economic incentive would be to only take delivery

There would be no purpose in fixing the price of the aircraft regardless of "any [subsequent] finding" if IAGCAS could accuse Saudia of breach based on that same "finding." "[A]n interpretation that renders certain contractual provisions surplusage 'cannot be countenanced under [New York] principles of contract interpretation.'" Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 850 F. App'x 38, 42 (2d Cir. 2021) (quoting In re Viking Pump, Inc., 27 N.Y.3d 244, 261 (2016)). Similarly, "a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect." AT&T Corp. v. Atos IT Sols. & Servs., Inc., 708 F. Supp. 3d 385, 401 (S.D.N.Y. 2023) (internal citation and quotation marks omitted). Accepting IAGCAS's interpretation would violate both these principles by overriding or rendering meaningless entire provisions of the contract. By contrast, Saudia's interpretation gives effect to both the "as is, where is" and "same condition" provisions: the aircraft were sold "as is, where is" and accepted "as is, where is" as of the date each Technical Acceptance Certificate was signed, but could not be damaged in the 180-day interregnum between execution of the TAC and delivery.

---

of the aircraft worth more than $5,885,000 and not take delivery of the aircraft" worth less. Id. ¶ 116.

The implications of Article 1(A) are equally clear. Because IAGCAS never conducted an in-person TAC inspection of any of the ten planes at issue in this case, Article 1(A)'s requirement that the planes be kept in the "same condition" between the TAC inspection and delivery was never triggered. Nor could Saudia invoke the "condition" of the planes upon "delivery," as the remaining ten planes were never delivered. Therefore, even assuming (i) the planes were not kept in a long-term maintenance and storage program and (ii) this altered their "condition," Article 1(A) was not breached.

### ii.  Article 1(D)

As an alternative to Article 1(A), IAGCAS offers several other theories as to how Saudia's decision not to place the aircraft in a long-term maintenance and storage program constituted a "failure to perform," which we will address in turn.

First, IAGCAS argues that Article 1(D) required Saudia to "keep the engines in a serviceable condition." Opp. at 14-15. Even assuming, _arguendo_, that not placing the planes in a long-term maintenance program actually did render the engines unserviceable, this would not have violated the contract. Article 1(D) reads as follows:

> Seller indicates engines are expected to be in serviceable condition but without any representation or warranty that they are serviceable and without any liability what so ever

36

> [sic] on the part of Seller in the event the engines
> are not serviceable.

SA § 1(D) (emphasis added).[61]  This provision is clear.  Saudia disclaimed "any representation or warranty that [the engines] are serviceable" and "any liability what so ever [sic]" in the event they were not.  Id.

The Court agrees with Saudia that the first part of the sentence stating what is "expected" is "'precatory language' and 'unenforceable.'"  Reply at 5 (citing Advanced Water Techs., Inc. v. Amiad U.S.A., Inc., 457 F. Supp. 3d 313, 320 (S.D.N.Y. 2020)); see also PRECATORY WORD, Black's Law Dictionary (12th ed. 2024) ("Collectively, expressions of requests, desires, or recommendations, as distinguished from commands . . .").  IAGCAS argues that "Courts [must] interpret contracts to give every clause meaning" and that "Saudia urges th[e] Court to ignore" Article 1(D).  Opp. at 16.  However, not all contractual language rises to the level of a binding obligation.  Indeed, other courts in this district have found the expectation references such as those in Article 1(D) unenforceable.  See, e.g., CapLOC, LLC v. McCord, No. 17 Civ. 5788 (AT) (RWL), 2018 WL 3407708, at *11 (S.D.N.Y. June 12, 2018) (finding the contract "replete with precatory language, for example, that earn-out payments are 'expected to be

---

[61]   11 of the 13 planes came with engines, but two came with no engines at all.  SA § 1(A).  For these two aircraft, Saudia promised to deliver an additional "two (2) unserviceable engines."  SA § 1(A).

$16,505,00,' and that Eli Global 'expect[s] [their] customary due diligence' would be conducted") (alterations in original).  The inference that such language is precatory is especially strong where, as here, there are disclaimers immediately following the "expectations" described.  For example, in In re Gulf Oil/Cities Serv. Tender Offer Litig., the Court found that "[t]his language is descriptive and precatory[ and] does not create a contractual obligation[:] [t]he reader is told Gulf 'expects' the FTC to scrutinize the transaction, that Gulf 'believes' there are no antitrust problems that would prevent consummation, but that there can be 'no assurance' that the FTC will not mount an antitrust challenge; and if it does, there can be no assurance what the result will be, including litigation and an injunction barring the merger."  725 F. Supp. 712, 729 (S.D.N.Y. 1989).  At bottom, IAGCAS cannot hold Saudia responsible for failing to perform an obligation Saudia explicitly disclaimed in the contract.

### iii.    Article 2(D)

IAGCAS also points to Article 2(D) of the Agreement.  Opp. at 16.  Article 2(D) specifies that if "IAGCAS had not taken delivery of the Aircraft within 180 days of its acceptance: '[IAGCAS] shall thereupon bear all the cost associated with the AIRCRAFT including but not limited to maintenance, storage, and parking of such delayed AIRCRAFT.'"  Id. (quoting SA § 2(D)).  IAGCAS argues that "[t]his cost shifting provision clearly assumed that Saudia was

incurring costs related to maintenance and storage" before the planes were delivered.  Id.

This contention fails for two reasons.  First, a cost-shifting provision listing "maintenance," "storage," and "parking" cannot be read as a promise to place aircraft in a formalized, long-term program.  Such a provision does not indicate whether the planes are being "maintained" or "stored" or "parked."  Rather, it allocates whatever undefined costs might be incurred to IAGCAS in the event of a delay.  Second, IAGCAS must bear the consequences of any assumption they made as to the maintenance of the aircraft, as the contract clearly included a disclaimer of implied warranties.  See SA §§ 11(1) (listing only three "Representations and Warranties of SELLER" regarding marketable title and other unrelated issues), 11(2) (disclaiming "EXCEPT FOR THE WARRANTY . . . MADE IN SECTION 11.1(c) . . . ALL OTHER WARRANTIES, GUARANTEES OR LIABILITIES, EXPRESSED OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING, WITHOUT LIMITATION, ANY OBLIGATION OR LIABILITY WITH RESPECT TO FITNESS, MERCHANTABILITY, [or] AIRWORTHINESS" of the aircraft).  IAGCAS, a sophisticated and represented party, signed the Agreement with this clause and thus cannot rely on warranties not explicitly present in the agreement.  See Reply at 6 (citing Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 785 (2d Cir. 2003) ("the Agreement . . . explicitly disclaims any representations about . . . airworthiness" and "the term 'as is,'

39

when used in a contract for the sale of goods, negates all implied warranties concerning the condition of the goods")); see also Williams Rebuttal Report ¶¶ 18-29 (preservation conditions, if contemplated by the parties, are almost always negotiated and specified in the body of the contract).

### iv.    Express Representations

Next, IAGCAS argues that Saudia made false representations to its regulator and/or IAGCAS by failing to follow internal standards regarding maintenance.  Opp. at 15-16.  According to IAGCAS, "Saudia's own Operations Specifications required Saudia to place the Aircraft in a long-term maintenance and storage program."  Id. at 15 (citing D's 56.1 ¶¶ 3, 21).  IAGCAS also insists that "[t]he Aircraft records contained false confirmations by Saudia and a false certification to GACA, the Kingdom's aviation regulator, that the Aircraft had been placed in Saudia's approved long-term storage and maintenance program."  Id. (citing D's 56.1 ¶¶ 4-7, 23-25).  IAGCAS's argument fails for several reasons.

At the outset, Saudia's "Operations Specifications" do not create a clear obligation to maintain the aircraft in a particular program.  The relevant guidance IAGCAS points to is "Form D106," which Saudia provided to GACA regulators to certify that the aircraft were at the "end of operation."  See D's 56.1 ¶ 3 (citing ECF No. 100-34 ("Form D106")).  Form D106 stated that the used aircraft had been taken out of operations as of a given date

40

(mostly in 2017) and that they should be maintained "in accordance with their long-term maintenance and storage procedures specified in the certificate holder's maintenance manual."  See D's 56.1 ¶ 3; P's 56.1 Response ¶ 3.   Neither party specifies what the "certificate holder's maintenance manual" is or what it says. Saudia submitted a sworn declaration from Ameen Khudawrdi, pursuant to 28 U.S.C. § 1746, representing that storage and maintenance under D106 are "solely up to the operator, and GACA does not dictate the terms of storage and maintenance, nor can it, as the maintenance and storage procedures vary widely from aircraft to aircraft, to the operational needs of the aircraft owner, to the place of storage and a myriad other factors."  Khudawardi Decl. ¶ 18.   Saudia's ability to use discretion is reflected in Form D106 itself, which, by its own words, pertains to aircraft in "long term maintenance or storage."  Form D106 at 3-4 (emphasis added). Other cited communications to regulators and other parties are similarly noncommittal.[62]  See D's 56.1 ¶¶ 4-6; P's 56.1 Response ¶¶ 4-6.

Moreover, IAGCAS's cited evidence does not show that "the [D106] Certificate" provided to GACA in 2017 "was included in the maintenance records for the Aircraft" as part of the exchange of

---

[62]   Saudia argues that IAGCAS has failed to identify any law or government regulation that was violated by its discretionary decision and argues that, in any case, a government regulation does not give rise to a private cause of action.

records pursuant to the Agreement.  D's 56.1 ¶ 7; see also Opp. at 15 (citing ECF Nos. 100-29 (Rosenburg Ex. CC, consisting of 2017 correspondence between Saudia, SAEI), 100-30 (Rosenberg Ex. DD, an additional Form D106 from 2018), 100-26 (Rosenberg Ex. Z).[63]  As Saudia observes, none of these documents is attached to correspondence or otherwise indicates that it was conveyed to IAGCAS before the contract was signed.  Reply at 6.  Put simply, even if the D106 certificate or other documents did imply a particular maintenance or storage regime, IAGCAS cannot show it actually received and/or relied on these documents.  Even if IAGCAS could prove Saudia provided the Form D106 or similar document to IAGCAS, the contract disclaimed any "express or implied" representations or warranties not contained in the contract.  SA § 11(2); see also supra Discussion Section II.a.iii.

Lastly, the location of the planes -- as parked outside near Jeddah and Riyadh airports -- was known to IAGCAS before the contract was signed.  Brian Cooper, the IAGCAS principal who repudiated the Agreement due to "price" concerns, describes the pre-contract, preliminary inspection of the aircraft as follows:

> IAGCAS was able to "see" at least one of the Aircraft while it was parked at Saudia's facilities in the Kingdom of Saudi Arabia[.] . . . [O]ne could "see" the Aircraft . . . from the airports, [but]

---

[63]    ECF No. 100-26, produced as "Rosenburg Exhibit Z" is a March 2020 Notice from Saudia to IAGCAS, informing IAGCAS that delays in delivery had resulted in complaints from GACA to Saudia regarding the continued presence of the planes at Jeddah and/or Riyadh airports, but saying nothing about maintenance or storage procedures.  See generally ECF No. 100-26.

> it was not possible to get anywhere close to the Aircraft <u>parked in the desert</u> without official clearance from Saudia and the Kingdom . . . or perform any maintenance or repair on the Aircraft while they were <u>parked in the desert, far from any maintenance facilities</u>.

Cooper Decl. ¶¶ 5-6 (emphasis added).  In other words, Mr. Cooper and/or his staff could "see" the planes were "parked in the desert, far from any maintenance facilities" at the time the pre-contract "initial inspection" of documentation was ongoing in 2018 through early 2019.  Id.  TAC inspectors were also aware these massive aircraft were parked outside because each had to be wheeled into the hangar for inspection.  See D's 56.1 Response ¶ 110.  Yet, there is no evidence in the record that IAGCAS asked about a maintenance program, raised concerns about the fact the planes were "parked in the desert," or made any effort to get specific representations from Saudia as to their storage and maintenance before signing the contract.  Nor is there any evidence that IAGCAS, when it accepted the first three of the 13 planes in late 2019 and 2020 noticed or complained about their condition, even though many months had passed since the "initial inspection" and even though they had been stored in the supposedly improper manner that entire time.

Ultimately, IAGCAS has failed to identify any contractual duty owed by Saudia regarding plane maintenance that Saudia failed to perform.

### b. Reasonable Efforts

Next, in a short section of its brief, IAGCAS argues that Saudia failed to perform under Article 2(A) because it did not "use reasonable efforts" to assist IAGCAS in reviewing records and conducting TAC inspections.  Opp. at 17-18 (citing SA § 2(A) (requiring Saudia to "use reasonable efforts to assist BUYER's inspection of the AIRCRAFT, and all associated records")).  Saudia argues that IAGCAS's specific complaints arise almost exclusively from its interactions with third-parties, including GACA, SAEI, and the Saudi military, rather than Saudia.  Mot. at 13-15; Reply at 7-8.  Saudia further argues that its employees made significant, daily efforts to assist IAGCAS, by helping IAGCAS secure Visas, providing documents, and helping IAGCAS liaise with third parties. Mot. at 13-15; Reply at 7-8.

The Court finds that there is no genuine dispute as to whether Saudia made "reasonable efforts."  At the outset, "reasonable efforts" or "commercially reasonable efforts" clauses in contracts are "fairly lenient."  InspiRx, Inc. v. Lupin Atlantis Holdings SA, 554 F. Supp. 3d 542, 556 (S.D.N.Y. 2021).[64]  Generally, a

---

[64]    Some of Saudia's cited cases do not involve "reasonable efforts" clauses, like Article 2(A), but rather "commercially reasonable efforts" clauses.  See, e.g., InspiRx, Inc., 554 F. Supp. 3d at 555.  The Second Circuit has suggested there may be a difference between the standards for each, with "commercially reasonable" clauses being more akin to a "best efforts" requirement, while "reasonable efforts" clauses impose a "less stringent" standard more akin to good faith.  See Holland Loader Co., LLC v. FLSmidth A/S, 313 F. Supp. 3d 447, 469 (S.D.N.Y. 2018), aff'd, 769 F. App'x 40 (2d Cir. 2019) (discussing In re Chateaugay Corp., 198 B.R. 848 (S.D.N.Y. 1996), aff'd, 108 F.3d 1369 (2d Cir.

44

"contractual obligation to use 'reasonable efforts' . . . require[s] [the promisor] to work in good faith and to the extent of its capabilities to produce" a desired result. Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012). However, "reasonable efforts . . . are not necessarily the same as actual success." Id. (holding that "[s]o long as [the promisor] used reasonable efforts in its attempt to manufacture [] fuel cells," the agreement "imposed no obligation to provide any cells, much less a quantity sufficient to distribute"). A "reasonable effort" is "at the very least some conscious exertion to accomplish the agreed goal, but something less than a degree of efforts that jeopardizes one's business interests." Holland Loader Co., LLC, 313 F. Supp. 3d at 473. "Reasonable efforts" are to be evaluated "objectively" in light

---

1997)). Other courts observe little or no distinction between the various "efforts" clauses. See, e.g., Spencer-Smith v. Ehrlich, No. 23 Civ. 02652 (LJL), 2026 WL 305215, at *13 (S.D.N.Y. Feb. 5, 2026) ("When interpreting the meaning of a 'reasonable efforts' clause, New York courts use the term 'reasonable efforts' interchangeabl[y] with 'best efforts'") (quoting Soroof Trading Dev. Co. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 511 (S.D.N.Y. 2012). Ultimately, however, even "best efforts" clauses allow for a party to give "reasonable consideration to its own interests in determining an appropriate course of action to reach the desired result." In re Chateaugay Corp., 198 B.R. at 854 (citation and internal quotation marks omitted).

either of the contract itself or from industry practice.[6566]  Id.;

see also MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 950 F.

Supp. 2d 568, 617 (S.D.N.Y. 2013).

---

[65]   Here, IAGCAS has offered no expert testimony or other evidence on what "reasonable efforts" to "assist . . . inspection" of the aircraft or "associated records" means in the context of the aviation industry as a whole.[65]  See Opp. at 17-18.  However, Saudia has provided some guidance on records production in its expert report.  As Mr. Williams observes, Article 1(C) cabins Saudia's obligation to "assist inspection" of "records" by only requiring that Saudia produce "available" records and specifying that "[m]issing documents or certificates [would] not result in non-acceptance of the aircraft or termination of the sale."  William Report ¶ 69 (quoting SA § 1(C)).  Mr. Williams says that this provision "is atypical of aviation contracts, which usually define the universe of required documentation."  Id. ¶ 70; see also id. ¶¶ 71-73 (describing the importance of records, "especially . . . where the aircraft is being sold towards or at the end of its lifecycle").  Williams opines that Article 1(C)'s disclaimer provision as shifting "a tremendous amount of risk onto the buyer," and that such terms are a reflection of a "severely discounted" price.  Id. ¶¶ 68, 77.  Regardless of Mr. William's report, it is self-evident from the contract itself that the parties agreed to severely cabin Saudia's responsibility to only "available" and "pertinent" documents within Saudia's "possession."  SA §§ 1(B)-(C), 2(A).  To the extent Saudia had an obligation to make "reasonable efforts," the Court must evaluate that obligation in light on these disclaimers.

[66]   Generally, "[w]hen the term 'commercially reasonable efforts' is not defined by the contract, courts in this district require the party seeking to enforce the efforts provision to establish the objective standard by which the breaching party's efforts are to be judged, in the context of the particular industry."  Holland Loader, 313 F. Supp. 3d at 472.  Here, IAGCAS is arguably the party "seeking to enforce" the efforts provision by putting forward the argument.  And if IAGCAS had brought its allegations regarding Saudia's purported breach of Article 2(A)'s "reasonable efforts" clause as a counterclaim, the burden would clearly be on IAGCAS to provide the industry standard.  See, e.g., MBIA Ins. Corp., 950 F. Supp. 2d at 617.  However, the posture here is different: it is Saudia seeking summary judgment for breach of contract, which requires as one of its elements that Saudia performed its obligations under the Agreement.  Ultimately, the Court does not construe the lack of greater guidance regarding "reasonable efforts" in the aviation industry against either party.  Rather, it finds that "there is no evidence indicating the existence of a material factual dispute concerning whether [Saudia's] practices were commercially unreasonable."  Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M), 349 F.3d 277, 283 (6th Cir. 2003).  This approach is further bolstered by (i) the uncontroverted, albeit limited, standards discussed by Saudia's expert, see supra p. 46 n.66, (ii) the fact that IAGCAS's allegations almost exclusively involve third parties not subject to Article 2(A), and (iii) the guidance provided by the contract itself as to which aircraft records were to be produced, and what the consequences of failing to produce those records were.

Second, a close examination of IAGCAS's statement of material facts and underlying documents reveals that IAGCAS was primarily frustrated not by Saudia, but rather by SAEI and the Jet Propulsion Center ("JPC").[67]  SAEI is an MRO provider, and JPC is a specific facility owned by SAEI in Jeddah.[68]  In order to procure much of the "back-to-birth" documentation, IAGCAS had to get it from SAEI and JPC.[69]  Cooper Decl. ¶¶ 26-27.  But, to IAGCAS's frustration, SAEI and/or JPC were slow to provide the information unless Saudia requested it.  See ECF No. 100-3 ("Arthur Williams Tr.") at 93:19–94:1 ("[B]ecause we were dealing with multiple engines, and most of those multiple engines had donor parts from donor engines, we were running into problems getting that information.  It was not being provided to us because it had to come from a third party, which, because we're not the owners, we can't directly request. That [request] has to come from the airline[.]").  IAGCAS was similarly frustrated by the difficulty of gaining permissions from the Saudi military and airport authorities, which controlled the

---

[67]    See D's 56.1 ¶¶ 1-2, 8-17; P's 56.1 Response ¶¶ 1-2, 8-17.

[68]    P's 56.1 ¶¶ 77-78; D's 56.1 Response ¶¶ 77-78.  Although IAGCAS answers Paragraph 78 of P's 56.1 as "denied," the Court finds its answer nonresponsive because it does not concern JPC and is unsupported by any citation, except the same repetitive citation to a single line on the Saudia website.  See D's 56.1 Response ¶ 78.

[69]    By way of example, "SAEI and JPC maintained hard copy records and technical reports for the relevant aircraft."  P's 56.1 ¶ 87; D's 56.1 Response ¶ 87.  Similarly, "[a]nother major issue is at JPC there is only 2 Gentlemen that have the knowledge to put the LLP Trace together for the Fan Blades which must be done before the Ferry can be approved by the FAA."  P's 56.1 Response ¶ 12; see also D's 56.1 ¶ 12.

47

airport facilities, but were not under the control of Saudia.  See, e.g., P's 56.1 ¶ 85 ("I couldn't gain access to that facility [the airport] due to the security being controlled by the military, Saudi military versus Saudi Airlines personal security."); see also D's 56.1 Response ¶ 85 ("Admit.").

Although IAGCAS describes SAEI and/or JPC as "division[s]" of Saudia, it is clear from the record that they are legally distinct entities.  "SAEI was spun-off from Saudia and makes independent decisions regarding its allocation of resources."  P's 56.1 ¶ 76. JPC is owned by SAEI.  P's 56.1 ¶ 76; D's 56.1 ¶ 78.  To contradict the numerous documents showing SAEI and JPC as legally-distinct entities, IAGCAS repeatedly points to a single line of Saudia's website describing SAEI as "Saudia Arabian Arilines' [sic] Engineering and Maintenance Center[.]"  D's 56.1 Response ¶¶ 76, 80.  Saudia counters by pointing to specific evidence that Saudia has to hire and sign contracts with SAEI in order to obtain support for its aircraft, see P's 56.1 ¶ 80; D's 56.1 Response ¶ 80, and that IAGCAS also signed independent contracts with SAEI to secure SAEI's assistance, P's 56.1 ¶ 81; D's 56.1 Response ¶ 81 (IAGCAS signed a separate contract with SAEI "for support . . . with their work on the subject aircraft").  Given the foregoing evidence, it is clear there is no genuine dispute.  While IAGCAS executives may have believed that Saudia exercised informal "control . . . over SAEI and JPC" because "all report to the King," see P's 56.1 ¶ 84;

48

D's 56.1 Response ¶ 84, IAGCAS has put forward no evidence that this is, in fact, the case.

To the extent Saudia did have a relationship with SAEI and JPC, or was able to exert its influence to prompt these separate entities to act, Saudia provided such assistance. For example, "[o]n October 22, 2019, Saudia requested that SAEI provide landing gear reports requested by IAGCAS." P's 56.1 ¶ 91; D's 56.1 Response ¶ 91. Saudia also worked on more formal solutions, including suggesting to IAGCAS that it "consider signing a technical assistance agreement with SAEI to facilitate planning of the requested tasks; rather than working them in add-hock [sic] basis."[70] P's 56.1 ¶¶ 81-97, 108; D's 56.1 Response ¶ 81-97, 108. Separate from aircraft documentation, Saudia provided extensive assistance to IAGCAS in helping it obtain Visas from the Saudi government, with evidence showing long email and other exchanges both before and again after the Covid-19 pandemic. See P's 56.1 ¶¶ 109-11, 145-56; D's 56.1 Response ¶¶ 109-11, 145-56. Saudia also helped IAGCAS interact with airport authorities and the Saudi

---

[70]    Perhaps the best descriptions of the dynamic between the parties come from IAGCAS's executives themselves. Mr. Cooper testified as follows:

> The SAEI and Saudi folks would, you know -- honestly I believe that, you know, they -- they're good people. Like you know, they weren't intentionally trying to block us. But without Saudia specifically stating to [SAEI] that they had to support us and get it done . . . it just never happened. . . . they're not dumb or incompetent. They're just, maybe you know, don't want to work as much.

D's 56.1 Response ¶ 96 (quoting Cooper Tr. 173:10-174:4).

military.  P's 56.1 ¶¶ 145-56; D's 56.1 Response ¶¶ 145-56.  Mr. Cooper's declaration makes clear that "we spoke with Saudia's representatives every day" while the inspections were going on. Cooper Decl. ¶ 28.  And although some requests took "days," and sometimes "weeks," information flowed and inspections and deliveries continued until IAGCAS repudiated the Agreement on November 11, 2020.[71]  Id. ¶ 29.  This last point is critical: Saudia's efforts were not merely earnest but actually succeeded in delivering three planes.

It is also far from clear that IAGCAS was upset by the delays. In response to an email from Saudia reminding IAGCAS of the deadline to complete inspections, Cooper forwarded that email to Luna and said "[w]e need to request 6 more visas to stretch the clock . . . this will re-set the clock I hope."  P's 56.1 ¶ 110; D's 56.1 Response ¶ 110.

For all the preceding reasons, the Court concludes that there is no genuine dispute of fact that Saudia performed its obligations under the Agreement up through November 11, 2020, when IAGCAS repudiated the contract.  Moreover, as will be discussed later, Saudia made significant efforts and had every motivation to

---

[71]    IAGCAS cannot claim to have been entirely surprised by the process, as it had already bought "four MD-11 aircraft" and one 777-200ER from Saudia in 2017. P's 56.1 ¶¶ 29-32; D's 56.1 Response ¶¶ 29-32.  As Dr. Bjaili of Saudia wrote in an email to Cooper, "please stop blaming the process.  When we put the 180 days for delivery in the contract, you took the process length in consideration. There is nothing new to you as this is not the first time you bought aircraft from Saudia."  P's 56.1 ¶ 141; D's 56.1 Response ¶ 141.

mitigate its damages after IAGCAS's breach.  See Discussion Section IV.

### III. Affirmative Defenses

Plaintiff has moved to strike IAGCAS's affirmative defenses, including breach of implied covenant, frustration of purpose, force majeure, liquidated damages, indemnification, various equitable claims, unjust enrichment, and waiver.  Mot. at 15-16, 23-28.  "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense -- on which the defendant bears the burden of proof at trial -- a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case."  FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (internal citation and quotation marks omitted).  And "since Defendants bear the burden of proving their affirmative defenses at trial, Plaintiff is not required to support its summary judgment motion with affidavits or other materials that tend to disprove the defenses."  TufAmerica, Inc. v. Codigo Music LLC, 162 F. Supp. 3d 295, 334 (S.D.N.Y. 2016).  "Rather, where the non-movant 'fails to introduce any evidence sufficient to support an essential element of a defense, the court may properly grant summary judgment dismissing such a defense as a matter of law.'"  Id. (quoting UMG Recording, Inc. v. Escape Media Grp., Inc., No. 11 Civ. 8407 (TPG), 2014 WL 5089743, at *18 (S.D.N.Y. Sept. 29, 2014)).

### a. Breach of Implied Covenant

IAGCAS endeavors to recast its failure to perform arguments, see Discussion Section II, as a "breach of implied covenant" affirmative defense. Opp. at 27-29. The implied covenant of good faith and fair dealing prohibits "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 27 (citing Gaia House Mezz LLC v. State St. Bank & Tr. Co., 720 F.3d 84, 93 (2d Cir. 2013) (quotations omitted)). The substantive arguments in support of this affirmative defense are the same as those previously discussed: that Saudia failed to (i) properly maintain the aircraft, (ii) deliver serviceable engines, and (iii) provide records and assistance in a timely manner. Opp. at 28-29.

IAGCAS's restated arguments are self-defeating because "the implied covenant of good faith cannot create duties that negate explicit rights under a contract." LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc., 725 F.3d 184, 195 (2d Cir. 2013). Similarly, "a plaintiff may not invoke the implied covenant 'to create terms that do not exist in the writing.'" Liberty Cap. Grp. v. Oppenheimer Holdings Inc., 802 F. Supp. 3d 701, 714 (S.D.N.Y. 2025) (quoting Vanlex Stores, Inc. v. BFP 300 Madison II, LLC, 66 A.D.3d 580, 581 (1st Dep't 2009)). The "where is, as is" structure of the contract, as well as the many disclaimers as to the planes' condition and availability of documents, anticipated the

52

possibility of the problems IAGCAS now identifies, and assigned those risks to the buyer (IAGCAS).  SA §§ 1(A)-(D), 2(A), 11(2). Such provisions, especially when made by sophisticated parties such as IAGCAS, warrant the dismissal of any implied covenant claim or defense.  See Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York, 762 F. Supp. 3d 247, 286 (S.D.N.Y. 2025), aff'd, No. 25-1144, 2026 WL 1328199 (2d Cir. May 13, 2026).

Furthermore, to the extent that implied covenant claims do not require an explicit contractual duty, IAGCAS's arguments still fall short.  Despite having the benefit of extensive discovery, IAGCAS has not made any showing that Saudia acted in bad faith. See Liberty Capital Grp., 802 F.Supp.3d 701, at 714-15.  Saudia's maintenance of the planes outside of a formal program was either known to IAGCAS or discoverable with reasonable diligence and preceded the signing of the contract.  See Discussion Section II.a. Saudia also made earnest efforts to provide records, secure Visas for IAGCAS personnel, and coordinate with third-parties.  See supra Discussion Section II.b.  Not even IAGCAS's leadership believed Saudia acted in bad faith.  In the words of Mr. Cooper, "[t]he . . . Saudi[a] folks . . . honestly I believe that, you know, they -- they're good people. Like they weren't intentionally trying to block us[.]"  P's 56.1 ¶ 96; D's 56.1 Response ¶ 96.

53

### b. Frustration

IAGCAS asserted the affirmative defense of "frustration of purpose" and impossibility in its answer. See Answer at 8. Saudia urges the Court to reject this defense. Mot. at 23-25. In opposition, IAGCAS simply repeats its arguments as to why Saudia failed to perform: Saudia "1) fail[ed] to keep the Aircraft in a storage preservation program . . . ; 2) fail[ed] to make available the necessary Aircraft records . . . in a timely manner; 3) fail[ed] to keep the engines in a serviceable condition; and 4) fail[ed] to make all of the Aircraft available for inspection." Opp. at 20. Our earlier discussion demonstrated that Saudia did not fail to perform any of these express or implied obligations identified by IAGCAS. See supra Discussion Section II.

Frustration of performance requires "intentionally and purposely . . . prevent[ing] the other party from carrying out the agreement." Roswell Cap. Partners LLC v. Alternative Const. Techs., 638 F. Supp. 2d 360, 369 (S.D.N.Y. 2009) (quoting Syracuse Orthopedic Specialists, P.C. v. Hootnick, 42 A.D.3d 890, 892 (4th Dep't 2007)); see also Opp. at 20 (citing Roswell Cap. Partners LLC, 638 F. Supp. 2d at 369). This "intentionality" requirement raises IAGCAS's burden even higher and, in any case, is rebutted by the undisputed statements made by Cooper that Saudia was acting in good faith. P's 56.1 ¶ 96; D's 56.1 Response ¶ 96.

54

Furthermore, impossibility "offers a defense against enforcement of a contract when the reasons for performing the contract cease to exist due to an unforeseen event." CAI Rail, Inc. v. Badger Mining Corp., No. 20 Civ. 4644 (JPC), 2021 WL 705880, at *7 (S.D.N.Y. Feb. 22, 2021).  However, Courts in this district have explicitly rejected the Covid-19 pandemic as a basis for claiming impossibility simply because it made a pre-pandemic agreement unprofitable for one of the parties.  For example, in CAI Rail, Inc. "it [could ]not be said that the foundation of the contract -- to lease rail cars, . . . has been 'destroy[ed],'" even if "the [relevant] market may be down 'to the lowest level in 30 years'" following Covid-19 because "[the party seeking to avoid the contract] has not shown that [the market] has ceased to exist." Id. at *9.  Put simply, "'a change in market conditions or an increase in the cost of performance are insufficient grounds to assert' New York's frustration of purpose defense."  Id. at *8 (quoting Health-Chem Corp. v. Baker, 737 F. Supp. 770, 776 (S.D.N.Y.), aff'd, 915 F.2d 805 (2d Cir. 1990)).  Here, it is evident that Cooper did not view fulfilment of the contract as impossible as of November 11, 2020, when he stated "we have proven that [IAGCAS] can accomplish the task."  P's 56.1 ¶ 161; D's 56.1 Response ¶ 161.  Rather, Cooper and IAGCAS's concern was the change in market conditions following Covid-19, and the unwillingness of

its third-party source of funding to continue at the original "price." Id.

### c. Other Affirmative Defenses

IAGCAS raised a number of other affirmative defenses in its answer. See Answer at 6-8. Saudia moved in its opening brief to dismiss these affirmative defenses, including force majeure (as separate from delay),[72] liquidated damages, indemnification, waiver, and unjust enrichment. See P's 2(C) Letter at 3; Mot. at 23-28. Apart from a general statement that "IAGCAS' Affirmative Defenses Cannot be Dismissed as a Matter of Law," D's 2(C)Letter at 3, IAGCAS has failed to advance arguments in defense of, or even mention, any of its affirmative defenses other than breach of implied covenant, force majeure, and frustration. See Opp. at 20, 27-29. Consequently, the Court considers IAGCAS's other affirmative defenses to be waived. See Wilmington Tr. v. Winta Asset Mgmt. LLC, No. 20 Civ. 5309 (JGK), 2022 WL 2657166, at *5 (S.D.N.Y. July 8, 2022) (holding that where "plaintiff specifically addressed and moved to strike . . . affirmative defenses in [its] motion for summary judgment . . . the Answering Defendants waived those affirmative defenses by not raising them

---

[72] IAGCAS limits its force majeure argument -- as indeed it must -- to an argument that Article 6 of the contract excused "substantial delays" in performance, and does not argue that the force majeure clause allowed for termination. Opp. at 20-21; see supra Discussion Section I (discussing Article 6's "EXCUSABLE DELAY" provisions). Even if IAGCAS were able to invoke the force majeure clause (to excuse delay past the 180-day delivery deadline), it would not excuse its repudiation of the contract in its entirety on November 11, 2020.

in opposition to the plaintiff's motion for summary judgment");
Banyan v. Sikorski, No. 17 Civ. 4942 (LJL), 2021 WL 2156226, at
*2-4 (S.D.N.Y. May 27, 2021) (holding that "failure to respond to
arguments set forth in a moving party's brief is an adequate ground
for a Court to deem them abandoned"); Crotona 1967 Corp. v. Vidu
Bros. Corp., 925 F. Supp. 2d 298, 308 (E.D.N.Y. 2013) ("While
defendants listed . . . a number of defenses in their answer, . .
. these additional defenses are not raised by defendants in
opposition to summary judgment and so will not be considered
here.").

For the foregoing reasons, the Court finds that there is no
genuine dispute of material fact as to any of IAGCAS's affirmative
defenses and grants Saudia's motion to strike those defenses.

## IV. Damages

Having determined that Saudia is liable for breach of contract
as a matter of law, the Court turns to the issue of damages.
Saudia moves for damages pursuant to New York Uniform Commercial
Code § 2-706, which provides:

> Where the resale is made in good faith and in a
> commercially reasonable manner the seller may
> recover the difference between the resale price and
> the contract price together with any incidental
> damages . . . .

N.Y. U.C.C. § 2-706(1); see Mot. at 22-23.  The March 13, 2019
contract price for all 13 aircraft was $76,505,000 ($5,885,000 per
aircraft).  SA § 3.  IAGCAS paid for three planes before it

57

repudiated the contract, leaving a remaining unpaid balance for the ten remaining planes of $58,850,000. Mot. at 22; Reply at 10; see also P's 56.1 Reply (correcting a "a mathematical error that incorrectly totaled the price of the 10 aircraft as $57,350,000.00 instead of the correct total of $58,850,000.00"). After IAGCAS repudiated the contract in November 2020, Saudia made efforts to mitigate its damages by marketing the ten remaining planes to a different buyer.[73] See P's 56.1 ¶¶ 174-206; D's 56.1 ¶¶ 174-206. Saudia succeeded in reselling all ten planes by 2025, selling eight to ECT Aviation ("ECT") and two to another buyer, for a total value of $15,533,333.36. P's 56.1 ¶¶ 179, 206; D's 56.1 ¶¶ 179, 206. Saudia also retained the $1,500,000 security deposit for the planes after IAGCAS repudiated the Agreement. See P's 56.1 ¶¶ 49-50, 173; D's 56.1 ¶¶ 49-50, 173.

Pursuant to N.Y. U.C.C. § 2-706(1), Saudia correctly calculates the damages as "the contract price ($58,850,000) minus the resale price ($15,533,333.36) and Security Deposit ($1,500,000) for a total of $41,816,666.64 plus applicable interest and costs." Reply at 10.

### a. Mitigation

IAGCAS attempts to dispute the damages calculation by claiming that Saudia failed to mitigate its damages. Opp. at 23-

---

[73]   Saudia also succeeded in reselling the right of first refusal for eight additional planes to ECT. See P's 56.1 ¶ 178; D's Response ¶ 178.

25.   "It has long been the rule in New York that where there has been a breach of contract, the party who suffers damage by reason of the breach has a duty to minimize the damages and any award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them."  Opp. at 23 (quoting Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp., 269 F. Supp. 2d 206, 222 (S.D.N.Y. 2003)).  IAGCAS once again contends that Saudia failed to place the aircraft in an approved maintenance and storage program, and argues that this failure and consequent "deterioration" of the aircraft, was unreasonable.  Opp. at 23.

"The duty to mitigate damages . . . requires only reasonable, practical care and diligence, not extraordinary measures."  U.S. Bank Nat'l Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010).  Indeed, "efforts to avoid or mitigate the damages do not have to be successful, as long as they are reasonable."  In re WorldCom, Inc., 361 B.R. 675, 684 (Bankr. S.D.N.Y. 2007).  Unlike the liability analysis, "[t]he defendant has the burden of proving a duty to mitigate, as well as that the plaintiff failed to make diligent efforts to mitigate its damages." Pike Co., Inc. v. Tri-Krete Ltd., 772 F. Supp. 3d 353, 363 (W.D.N.Y. 2025) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 47 A.D.3d 103, 107, 846 N.Y.S.2d 95 (1st Dep't 2007)).

In support of its mitigation argument, IAGCAS relies on the calculation of its expert, Bob Cowgill, that "if the Aircraft had been placed in a preservation program, the value of the Aircraft at the time of the alleged breach would have been $34.80 million. [ ] However, because the Aircraft were not in a preservation program, their value at the time of the alleged breach was $7.30 million."[74][75]  Opp. at 24 (citing Cowgill Report at 6).  However, as Saudia correctly observes, "[o]nly after a contract has been breached does a duty to mitigate damages arise."  Reply at 10 (quoting Bank of N.Y. Mellon Tr. Co., v. Morgan Stanley Mortg. Cap., Inc., 2017 WL 698607, at *1 (S.D.N.Y. Feb. 10, 2017)).  Therefore, "[e]ven assuming IAGCAS's expert valuation of $7.30 million as of termination is true, IAGCAS cannot use pre-termination conduct to prove a failure to mitigate[.]"  Id.  The Court agrees with Saudia.  Even drawing all inferences in favor of IAGCAS, that the planes (i) were not maintained properly and (ii) were only worth $7.30 million as of November 11, 2020, IAGCAS has

---

[74]    IAGCAS also discovered an internal report by Oriel Consult Limited ("Oriel"), an external consultant hired by Saudia, which valued the ten planes at issue at $4.76 million.  D's 56.1 ¶ 38.  Even if this unsworn, third-party report were admissible, it was plainly incorrect: Saudia succeeded in selling the same planes to ECT for over $15 million.  It was also an analysis of the "part-out" value of the planes, meaning "the actual or estimated 'value of marketable parts and components that could be salvaged for re-use on other aircraft or engines.'"  P's 56.1 Response ¶ 38.

[75]    IAGCAS also points to an internal appraisal by Oriel, an external consultant hired by Saudia, which calculated the value of eight planes at $8.02 million dollars.  D's 56.1 ¶¶ 32-35.  However, the eight planes analyzed by Oriel were not the ten planes that are the primary focus of this dispute: rather, they are the eight separate planes that were subject to the right of first refusal.  See SA § 1(E) (granting a ROFR for eight additional aircraft).

failed to raise a genuine issue of material fact because the planes actually sold for $15,533,333.36 in 2023.  Put differently, Saudia cannot have failed to take proper steps, post-breach, if the value of the aircraft increased between the date of breach and the date of resale.[76]

Indeed, an examination of the undisputed facts regarding the resale process fails to raise genuine concerns that Saudia's effort was unreasonable.  Saudia assembled a "sale committee" and conducted a marketing process in which it solicited competing bids. P's 56.1 ¶ 175; D's 56.1 Response ¶ 175.  After it located a buyer (ECT) it negotiated an Agreement to sell the aircraft on June 7, 2023.  P's 56.1 ¶ 176; D's 56.1 Response ¶ 176.  Although the marketing and subsequent delivery of the aircraft resold took time, with "rolling" deliveries from 2023 to 2025, none of the documents pointed to by IAGCAS raise a genuine dispute as to the professionalism of the resale process.[77]  See D's 56.1 ¶¶ 23-50;

---

[76]    Lastly, underlying both the mitigation issue and the "failure to perform" aspect of the contract dispute lies a critical question: why would Saudia intentionally destroy the value of its own property?  It is undisputed that the planes were taken out of operation by 2017, two years before Saudia signed the Agreement with IAGCAS, and that they were not in a formal preservation program after 2017.  See D's 56.1 ¶ 23; P's 56.1 Response ¶ 23.  At all these times, a reasonable, a self-interested party would have compelling incentives to preserve the value of the aircraft.  To the extent Saudia did not place the planes in a formal program, it is likely because (i) a formal program was costly, see Williams Rebuttal Report ¶ 21, given the age of the planes and their value relative to maintenance costs or (ii) because Saudia had limited manpower or physical, e.g., hangar, capacity.

[77]    Perhaps IAGCAS's most interesting citation is to an unsigned, internal report addressed to Saudia's director general in 2021.  The report identified a number of impediments to the resale process, including the fact that most potential buyers were interested in the planes as freight vehicles, the fact

P's 56.1 ¶¶ 23-50.  In fact, Saudia seems to have been vigilant for better opportunities.  For example, Saudia renegotiated its agreement with ECT so that it could sell two of the ten aircraft to a different buyer for a higher price.  P's 56.1 ¶ 179; D's Response ¶ 179.

In sum, the Court finds that IAGCAS has failed to meet its burden to demonstrate that Saudia did not take "reasonable" steps to mitigate its damages.

### b. UCC Damages

IAGCAS also argues that UCC damages are not in order because Section 2-706 requires that "every aspect of the resale" must be reasonable "including the method, manner, time, place and terms." Opp. at 25 (quoting N.Y. U.C.C. § 2-706(1)).  We will address each of IAGCAS's arguments.

First, IAGCAS argues that under the U.C.C. "[t]he burden of establishing commercial reasonableness [of the resale process] rests squarely with the seller," in this case, Saudia.  Opp. at 26.  However, its single citation in support of this proposition

---

that Covid-19 had diminished their value, and that fact that "this type of GE90-90B engine is not used in other more modern aircraft types and therefore cannot be used as spares."  ECF No. 100-19 at 3.  IAGCAS points to only one factor mentioned in the report.  See D's 56 ¶ 50 (quoting ECF No. 100-19 at 3) ("potential buyers interested in operating these aircraft for passengers withdrew their offer once they inspected the aircraft and looked at the preservation status").  However, the letter does not elaborate on "preservation," or identify what, if any deterioration had taken place between November 11, 2020 and April 2022 when it was drafted.  And once the Court discounts pre-breach evidence, inadmissible evidence, and evidence only related to the ROFR planes, D's 56.1 ¶¶ 30-35, the evidence adduced by IAGCAS is anecdotal and insufficient to raise a genuine dispute of material fact.

does not suggest that the burden is as "square" as IAGCAS argues. The Court in Weihai Lianqiao Int'l Coop Grp. Co. v. A Base IX Co. LLC stated that "[t]he UCC does not specify who bears the burden of proof under § 2-706," but concluded, "based on a review of the limited caselaw addressing this issue, . . . that the initial burden of proof as to the reasonableness of the resale lies with the seller."  799 F. Supp. 3d 195, 241 (S.D.N.Y. 2025) (emphasis added).  The court also elaborated:

> Most treatises agree that the seller bears the initial burden. However, "the burden here is slight. About all a seller must do is introduce evidence of the resale price, allege that he acted reasonably and in good faith, and perhaps provide a brief scenario of the resale. The burden of going forward with the evidence that the resale was commercially unreasonable then rests with the buyer."

Id. at 242 (quoting Roy R. Anderson, Damages Under the Uniform Commercial Code § 4:24).  Saudia has more than met this "slight" burden by accounting for the resale price ($15,533,333.36), alleging that it acted reasonably, and provided not only a "brief," but a thorough recounting, of the sale process.  Id.  Having found that Saudia has met that "slight" "initial burden," it is clear that "[t]he burden . . . going forward . . . then rests with the buyer," IAGCAS.  Id.

IAGCAS also argues that the sale was commercially unreasonable because "Saudia did not re-sell the Aircraft for nearly three years."  Opp. at 26.  However, IAGCAS has offered

little to no evidence as to why selling a large number of multi-million-dollar aircraft in this amount of time was unreasonable. See generally D's 56.1.  The only citations IAGCAS offers are decades-old cases discussing the sale of securities and commodities.  See Bache & Co. v. Int'l Controls Corp., 339 F. Supp. 341, 352 (S.D.N.Y.), aff'd, 469 F.2d 696 (2d Cir. 1972) (holding that a delay of "one month to . . . two years" was an unreasonable time to resell securities); Apex Oil Co. v. Belcher Co. of N.Y., 855 F.2d 997, 1006-7 (2d Cir. 1988) (finding a six-week delay unreasonable for a sale of commoditized heating oil, in part by referencing "the analogous context of the securities markets"). These cases are not instructive: securities are highly liquid assets that can be sold to virtually any buyer (or buyers) with the funds to purchase them.  Commercial aircraft, however, are not liquid and generally require buyers with a high level of expertise in negotiating relevant contracts, appraising, restoring, and transporting them (such as IAGCAS).

IAGCAS also cites other cases for the general proposition that questions about the reasonableness of resale should be left for trial.  See Opp. at 26 (citing Highland CDO Opportunity Master Fund, LP. v. Citibank, N.A., 2013 WL 1191895 (S.D.N.Y. Mar. 22, 2013); N. Am. Foreign Trading Corp. v. Direct Mail Specialist, 697 F.Supp. 163, 167 (S.D.N.Y. 1988); Com. Com. Leasing, LLC v. PIO Enters., Inc., 78 A.D.3d 1105, 1107 (2d Dep't 2010)).  Although

this is a path courts have pursued where there is a genuine dispute of material fact, summary judgment is appropriate when there is no genuine dispute.   See, e.g., Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc., 770 F. Supp. 139, 148 (S.D.N.Y. 1991) (finding that "that the resale by [plaintiff] of the furs bid upon but not cleared by [defendant] was commercially reasonable as a matter of law" and awarding damages under N.Y. U.C.C. § 2-706(1)).   Courts have found no genuine dispute where, as here, the resale value was greater than IAGCAS's own expert's appraisal of the value of the planes at the time of breach.   See Chem. Bank v. Haseotes, No. 93 Civ. 2846 (LMM), 1994 WL 30476, at *4 (S.D.N.Y. Feb. 1, 1994) ("Plaintiff succeeds in demonstrating, as a matter of law, both that a commercially reasonable resale price was received and that commercially reasonable procedures were followed" because "Plaintiff has produced evidence that the prices paid for the vessels exceeded, by more than $4 million, an independent appraiser's valuation of the ships" and "Plaintiff did not have a duty to store and maintain the vessels . . ." to defendant's preferences).   IAGCAS's contentions regarding UCC damages fail.[78]

## Conclusion[79]

---

[78]    IAGCAS raises, once again, its concerns regarding the preservation of the aircraft, which fail for the same reasons stated supra, Discussion Sections II.a., IV.a.

[79]    Saudia requested oral argument but IAGCAS did not.   See Mot.; Opp. However, even if IAGCAS had requested oral argument, the Court finds that the

66

For the preceding reasons, plaintiff's motion for summary judgment is granted in its entirety and plaintiff is awarded contract damages in the amount of $41,816,666.64 plus interest incurred since the date of breach on November 11, 2020 and recoverable costs.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 76.

Dated:    New York, New York
          June 9, 2026

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

issues presented in this motion are resolvable on the basis of established law and the extensive briefing provided by the parties.